## MAGGIO *v.* ZEITZ, TRUSTEE IN BANKRUPTCY.

No. 38. Submitted October 13, 1947.—Decided February 9, 1948.

58

*Max Schwartz* submitted on brief for petitioner.

*Joseph Glass* and *Sidney Freiberg* submitted on brief for respondent.

MR. JUSTICE JACKSON delivered the opinion of the Court.

Joseph Maggio, the petitioner, was president and manager of Luma Camera Service, Inc., which was adjudged bankrupt on April 23, 1942. In January of 1943 the

trustee asked the court to direct Maggio to turn over a considerable amount of merchandise alleged to have been taken from the bankrupt concern in 1941, and still in Maggio's possession or control. After hearing, the referee found that "the Trustee established by clear and convincing evidence that the merchandise hereinafter described, belonging to the estate of the bankrupt, was knowingly and fraudulently concealed by the respondent [Maggio] from the Trustee herein and that said merchandise is now in the possession or under the control of the respondent." A turnover order issued and was affirmed by the District Court and then unanimously affirmed by the Circuit Court of Appeals, Second Circuit, without opinion other than citation of its own prior cases. *Zeitz* v. *Maggio,* 145 F. 2d 241. Petition for certiorari was denied by this Court. 324 U. S. 841.

As Maggio failed to turn over the property or its proceeds, the Referee found him in contempt. After hearing, the District Court affirmed and ordered Maggio to be jailed until he complied or until further order of the court. Again the Circuit Court of Appeals affirmed. 157 F. 2d 951.

But in affirming the Court said: "Although we know that Maggio cannot comply with the order, we must keep a straight face and pretend that he can, and must thus affirm orders which first direct Maggio 'to do an impossibility, and then punish him for refusal to perform it.' " Whether this is to be read literally as its deliberate judgment of the law of the case or is something of a decoy intended to attract our attention to the problem, the declaration is one which this Court, in view of its supervisory power over courts of bankruptcy, cannot ignore. Fraudulent bankruptcies probably present more difficulties to the courts in the Second Circuit than they do elsewhere. These conditions are reflected in conflicting views within the Court of Appeals, which we need not detail as they are

already set out in the books: *In re Schoenberg,* 70 F. 2d 321; *Danish* v. *Sofranski,* 93 F. 2d 424; *In re Pinsky-Lapin & Co.,* 98 F. 2d 776; *Seligson* v. *Goldsmith,* 128 F. 2d 977; *Rosenblum* v. *Marinello,* 133 F. 2d 674; *Robbins* v. *Gottbetter,* 134 F. 2d 843; *Cohen* v. *Jeskowitz,* 144 F. 2d 39; *Zeitz* v. *Maggio,* 145 F. 2d 241.

The problem is illustrated by this case. The court below says that in the turnover proceedings it was sufficiently established that, towards the end of 1941, a shortage occurred in this bankrupt's stock of merchandise. It seems also to regard it as proved that Maggio personally took possession of the corporation's vanishing assets. But this abstraction by Maggio occurred several months before bankruptcy and over a year before the turnover order was applied for. The only evidence that the goods then were in the possession or control of Maggio was the proof of his onetime possession supplemented by a "presumption" that, in the absence of a credible explanation by Maggio of his disposition of the goods, he continues in possession of them or their proceeds. Because the Court of Appeals felt constrained by its opinions to adhere to this "presumption" or "fiction" it affirmed the turnover order. Now it says it is convinced that in reality Maggio did not retain the goods or their proceeds up to the time of the turnover proceedings and that the turnover order was unjust. But it considers the turnover order *res judicata* and the injustice beyond reach on review of the contempt order.

The proceeding which leads to commitment consists of two separate stages which easily become out-of-joint because the defense to the second often in substance is an effort to relitigate, perhaps before another judge, the issue supposed to have been settled in the first, and because while the burden of proof rests on the trustee, frequently evidence of the facts is entirely in possession of his adversary, the bankrupt, who is advantaged by nondisclosure.

Because these separate but interdependent turnover and contempt procedures are important to successful bankruptcy administration, we restate some of the principles applicable to each, conscious however of the risk that we may do more to stir new than to settle old controversies.

## I.

The turnover procedure is one not expressly created or regulated by the Bankruptcy Act. It is a judicial innovation by which the court seeks efficiently and expeditiously to accomplish ends prescribed by the statute, which, however, left the means largely to judicial ingenuity.

The courts of bankruptcy are invested "with such jurisdiction in law and in equity as will enable them" to "Cause the estates of bankrupts to be collected, reduced to money and distributed, and determine controversies in relation thereto . . . ." 11 U. S. C. § 11 (a) (7). And the function to "collect and reduce to money the property of the estates" is also laid upon the trustee. 11 U. S. C. § 75 (a) (1). A correlative duty is imposed upon the bankrupt fully and effectually to turn over all of his property and interests, and in case of a corporation the duty rests upon its officers, directors or stockholders. 11 U. S. C. § 25.

To compel these persons to discharge their duty, the statute imposes criminal sanctions. It denounces a comprehensive list of frauds, concealments, falsifications, mutilation of records and other acts that would defeat or obstruct collection of the assets of the estate, and prescribes heavy penalties of fine or imprisonment or both. 11 U. S. C. § 52 (b). It also confers on the courts power to arraign, try and punish persons for violations, but "in accordance with the laws of procedure" regulating trials of crimes. 11 U. S. C. § 11 (a) (4). And it specifically provides for jury trial of offenses against the Bankruptcy

Act. 11 U. S. C. § 42 (a), (c). Special provisions are also made to induce vigilance in prosecuting such offenses. It is the duty of the referee and trustee to report any probable grounds for believing such an offense has been committed to the United States Attorney, who thereupon is required to investigate and report to the referee. In a proper case he is directed to present the matter to the grand jury without delay, and if he thinks it not a proper case he must report the facts to the Attorney General and abide his instructions. 11 U. S. C. § 52 (e).

Courts of bankruptcy have no authority to compensate for any neglect or lack of zeal in applying these prescribed criminal sanctions by perversion of civil remedies to ends of punishment, as some judges of the Court of Appeals suggest is being done.

Unfortunately, criminal prosecutions do not recover concealed treasure. And the trustee, as well as the Court, is commanded to collect the property. The Act vests title to all property of the bankrupt, including any transferred in fraud of creditors, in the trustee, as of the date of filing the petition in bankruptcy, 11 U. S. C. § 110, which puts him in position to pursue all plenary or summary remedies to obtain possession.

To entertain the petitions of the trustee the bankruptcy court not only is vested with "jurisdiction of all controversies at law and in equity" between trustees and adverse claimants concerning property acquired or claimed by the trustee, 11 U. S. C. § 46, but it also is given a wide discretionary jurisdiction to accomplish the ends of the Act, or in the words of the statute to "make such orders, issue such process, and enter such judgments, in addition to those specifically provided for, as may be necessary for the enforcement of the provisions of this title." 11 U. S. C. § 11 (a) (15).

In applying these grants of power, courts of bankruptcy have fashioned the summary turnover procedure as one

necessary to accomplish their function of administration. It enables the court summarily to retrieve concealed and diverted assets or secreted books of account the withholding of which, pending the outcome of plenary suits, would intolerably obstruct and delay administration. When supported by "clear and convincing evidence," the turnover order has been sustained as an appropriate and necessary step in enforcing the Bankruptcy Act. *Oriel* v. *Russell,* 278 U. S. 358; *Cooper* v. *Dasher,* 290 U. S. 106. See also *Farmers & Mechanics National Bank* v. *Wilkinson,* 266 U. S. 503.

But this procedure is one primarily to get at property rather than to get at a debtor. Without pushing the analogy too far, it may be said that the theoretical basis for this remedy is found in the common law actions to recover possession—detinue for unlawful detention of chattels and replevin for their unlawful taking—as distinguished from actions in trespass or trover to recover damages for the withholding or for the value of the property. Of course the modern remedy does not exactly follow any of these ancient and often overlapping procedures, but the object—possession of specific property—is the same. The order for possession may extend to proceeds of property that has been disposed of, if they are sufficiently identified as such. But it is essentially a proceeding for restitution rather than indemnification, with some characteristics of a proceeding *in rem;* the primary condition of relief is possession of existing chattels or their proceeds capable of being surrendered by the person ordered to do so. It is in no sense based on a cause of action for damages for tortious conduct such as embezzlement, misappropriation or improvident dissipation of assets.

The nature and derivation of the remedy make clear that it is appropriate only when the evidence satisfactorily establishes the existence of the property or its proceeds,

and possession thereof by the defendant at the time of the proceeding. While some courts have taken the date of bankruptcy as the time to which the inquiry is directed, we do not consider resort to this particular proceeding appropriate if, at the time it is instituted, the property and its proceeds have already been dissipated, no matter when that dissipation occurred. Conduct which has put property beyond the limited reach of the turnover proceeding may be a crime, or, if it violates an order of the referee, a criminal contempt, but no such acts, however reprehensible, warrant issuance of an order which creates a duty impossible of performance, so that punishment can follow. It should not be necessary to say that it would be a flagrant abuse of process to issue such an order to exert pressure on friends and relatives to ransom the accused party from being jailed.

## II.

It is evident that the real issue as to turnover orders concerns the burden of proof that will be put on the trustee and how he can meet it. This Court has said that the turnover order must be supported by "clear and convincing evidence," *Oriel* v. *Russell,* 278 U. S. 358, and that includes proof that the property has been abstracted from the bankrupt estate and is in the possession of the party proceeded against. It is the burden of the trustee to produce this evidence, however difficult his task may be.

The trustee usually can show that the missing assets were in the possession or under the control of the bankrupt at the time of bankruptcy. To bring this past possession down to the date involved in the turnover proceedings, the trustee has been allowed the benefit of what is called a presumption that the possession continues until the possessor explains when and how it ceased. This inference, which might be entirely permissible in

some cases, seems to have settled into a rigid presumption which it is said the lower courts apply without regard to its reasonableness in the particular case.

However, no such presumption, and no such fiction, is created by the bankruptcy statute. None can be found in any decision of this Court dealing with this procedure.[1] Language can, of course, be gleaned from judicial pronouncements and texts that conditions once existing may be presumed to continue until they are shown to have changed. But such generalizations, useful enough, perhaps, in solving some problem of a particular case, are not rules of law to be applied to all cases, with or without reason.

Since no authority imposes upon either the Court of Appeals or the Bankruptcy Court any presumption of law, either conclusive or disputable, which would forbid or dispense with further inquiry or consideration of other evidence and testimony, turnover orders should not be issued, or approved on appeal, merely on proof that at some past time property was in possession or control of the accused party, unless the time element and other factors make that a fair and reasonable inference.[2] Under some circumstances it may be permissible, in resolving the unknown from the known, to reach the conclusion of present control from proof of previous possession. Such a process,

---

[1] The Court of Appeals itself said: ". . . the Supreme Court has never decided in favor of the fictitious 'presumption' here invoked. . . ." 157 F. 2d 951, 954.

[2] Other circuits have treated the presumption of continued possession as one which "grows weaker as time passes, until it finally ceases to exist" (C. C. A. 8th in *Marin* v. *Ellis,* 15 F. 2d 321) and as one "only as strong as the nature of the circumstances permits" and which "loses its force and effect as time intervenes and as circumstances indicate that the bankrupt is no longer in possession of the missing goods or their proceeds" (C. C. A. 4th in *Brune* v. *Fraidin,* 149 F. 2d 325). See also Comments in 95 U. of Pa. L. Rev. 789 (1947) and 42 Ill. L. Rev. 396 (1947).

sometimes characterized as a "presumption of fact," is, however, nothing more than a process of reasoning from one fact to another, an argument which infers a fact otherwise doubtful from a fact which is proved.

Of course, the fact that a man at one time had a given item of property is a circumstance to be weighed in determining whether he may properly be found to have it at a later date. But the inference from yesterday's possession is one thing, that permissible from possession twenty months ago quite another. With what kind of property do we deal? Was it salable or consumable? The inference of continued possession might be warranted when applied to books of account which are not consumable or marketable, but quite inappropriate under the same circumstances if applied to perishable merchandise or salable goods in considerable demand. Such an inference is one thing when applied to a thrifty person who withdraws his savings account after being involved in an accident, for no apparent purpose except to get it beyond the reach of a tort creditor, see *Rosenblum v. Marinello*, 133 F. 2d 674; it is very different when applied to a stock of wares being sold by a fast-living adventurer using the proceeds to make up the difference between income and outgo.

Turnover orders should not be issued or affirmed on a presumption thought to arise from some isolated circumstance, such as onetime possession, when the reviewing court finds from the whole record that the order is unrealistic and unjust. No rule of law requires that judgment be thus fettered; nor has this Court ever so prescribed. Of course, deference is due to the trial court's findings of fact, as prescribed by our rules, but even this presupposes that the trier of fact be actually exercising his judgment, not merely applying some supposed rule of law. In any event, rules of evidence as to inferences from facts are to aid reason, not to override it. And

there does not appear to be any reason for allowing any such presumption to override reason when reviewing a turnover order.

We are well aware that these generalities do little to solve concrete issues. The latter can be resolved only by the sound sense and good judgment of trial courts, mindful that the order should issue only as a responsible and final adjudication of possession and ability to deliver, not as a questionable experiment in coercion which will recoil to the discredit of the judicial process if time proves the adjudication to have been improvident and requires the courts to abandon its enforcement.

### III.

Unlike the judicially developed turnover proceedings, contempt proceedings for disobedience of a lawful order are specifically authorized by two separate provisions of the Act and are of two distinct kinds. The court is authorized to "enforce obedience by persons to all lawful orders, by fine or imprisonment or fine and imprisonment." 11 U. S. C. § 11 (a) (13). This creates the civil contempt proceeding to coerce obedience, now before us. There is also provision for a criminal contempt proceeding whose end is to penalize contumacy, the court also being authorized to "punish persons for contempts committed before referees." 11 U. S. C. § 11 (a) (16). These contempts before referees are defined to include disobedience or resistance to a lawful order, and the statute provides for a summary proceeding before the District Judge who, if the evidence "is such as to warrant him in so doing," may punish the accused or commit him upon conditions. 11 U. S. C. § 69.

The proceeding before us sought only a coercive or enforcement sanction. The petition asked commitment "until he shall have complied with the aforesaid turnover order." The commitment was only until he "shall have

purged himself of such contempt by complying with said turnover order, or until the further order of this Court." Thus no punishment whatever was imposed for past disobedience, and every penalty was contingent upon failure to obey. This is a decisive characteristic of civil contempt and of the truly coercive commitment for enforcement purposes, which, as often is said, leaves the contemnor to "carry the key of his prison in his own pocket." *Penfield Co.* v. *Securities & Exchange Commission,* 330 U. S. 585. We thus have before us now a civil contempt of the same kind that was before the Court in *Oriel* v. *Russell,* 278 U. S. 358, 363. What we say, therefore, is not applicable to criminal contempt proceedings designed solely for punishment and vindication of the court's flouted authority, such, for example, as a proceeding to sentence one for destroying or mutilating books of account or property in his possession which the court had ordered him to turn over.

The question now arises as to whether, in this contempt proceeding, the Court may inquire into the justification for the turnover order itself. It is clear however that the turnover proceeding is a separate one and, when completed and terminated in a final order, it becomes *res judicata* and not subject to collateral attack in the contempt proceedings. This we long ago settled in *Oriel* v. *Russell,* 278 U. S. 358, and, we think, settled rightly.

The court order is increasingly resorted to, especially by statute,[3] to coerce performance of duties under sanction

---

[3] For examples of statutory provisions, see Interstate Commerce Act, 49 U. S. C. § 12 (3); Securities Exchange Act of 1934, 15 U. S. C. § 78 (u) (c); Public Utility Holding Company Act of 1935, 15 U. S. C. § 79 (r) (d); Communications Act of 1934, 47 U. S. C. § 409 (d); National Labor Relations Act, 29 U. S. C. § 161 (2); Federal Trade Commission Act, 15 U. S. C. § 49; Administrative Procedure Act of 1946, 5 U. S. C. 1946 ed. § 1005 (c); and Atomic Energy Act of 1946, 42 U. S. C. A. (1947 Supp.) § 1816 (d).

of contempt. It would be a disservice to the law if we were to depart from the long-standing rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy. The procedure to enforce a court's order commanding or forbidding an act should not be so inconclusive as to foster experimentation with disobedience. Every precaution should be taken that orders issue, in turnover as in other proceedings, only after legal grounds are shown and only when it appears that obedience is within the power of the party being coerced by the order. But when it has become final, disobedience cannot be justified by re-trying the issues as to whether the order should have issued in the first place. *United States* v. *United Mine Workers,* 330 U. S. 258; *Oriel* v. *Russell,* 278 U. S. 358. Counsel appears to recognize this rule, for the record in the case now before us does not include the evidence on which the turnover order was based. We could learn of it only by going outside of the present record to that in the former case, which would be available only because an application was made to this Court to review that earlier proceeding.

We therefore think the Court of Appeals was right insofar as it concluded that the turnover order is subject only to direct attack, and that its alleged infirmities cannot be relitigated or corrected in a subsequent contempt proceeding.

## IV.

But does this mean that the lower courts "must thus affirm orders which first direct a bankrupt 'to do an impossibility, and then punish him for refusal to perform it' "?

Whether the statement by the Court of Appeals that it knows Maggio cannot comply with the turnover order

is justified by the evidence in this record, we do not stop to inquire. We have regarded turnover and contempt orders, and petitions for certiorari to review them, as usually raising only questions of fact to be solved by the careful analysis of evidence which we expect to take place in the two lower courts. The advantage of the referee and the District Court in having the parties and witnesses before them, instead of judging on a cold record, is considerable. The Court of Appeals for each circuit also has the advantage of closer familiarity with the capabilities, tendencies, and practices of the referee and District Judge. Both lower courts better know the fruits of their course of decision in actual practice than can we. Consequently, we have been loath to venture a review of particular cases, especially where the turnover order carries approval of the referee, the District Court and the Court of Appeals.

However, the court below appears to have affirmed the order for commitment in this case by relying on the earlier finding of previous possession to raise a presumption of wilful disobedience continuing to the time of commitment, even though that conclusion is rejected by the court's good judgment. While the court protests that such a presumed continuance of possession from the time of bankruptcy to the time of the turnover order is unrealistic, it seems to have affirmed the contempt order by extending the presumption from the time of the turnover order to the time of the contempt proceedings, although persuaded that Maggio had overcome the presumption if it were rebuttable.

The fact that the contempt proceeding must begin with acceptance of the turnover order does not mean that it must end with it. Maggio makes no explanation as to the whereabouts or disposition of the property which the order, earlier affirmed, declared him to possess. But time

has elapsed between issuance of that order and initiation of the contempt proceedings in this case. He does tender evidence of his earnings after the turnover proceedings and up until November 1944; his unemployment after that time allegedly due to his failing health; and of his family obligations and manner of living during the intervening period. He has also sworn that neither he nor his family has at any time since the turnover proceedings possessed any real or personal property which could be used to satisfy the trustee's demands. And he repeats his denial that he possesses the property in question.

It is clear that the District Court in the contempt proceeding attached little or no significance to Maggio's evidence or testimony, although the Court gave no indication that the evidence was incredible. The District Court in its opinion cites only *In re Siegler,* 31 F. 2d 972, in which the Court of Appeals reversed a District Judge who, because he believed the bankrupt's testimony, had refused to commit him for contempt. The *Siegler* case and other cases decided by the Court of Appeals apparently led the District Judge to conclude that no decision other than commitment of Maggio would be approved by that court.

Nor did the Court of Appeals reject this view. Indeed it affirmed the commitment for contempt because it considered either that present inability to comply is of no relevance or that there is an irrebuttable presumption of continuing ability to comply even if the record establishes present inability in fact. It seems to be of the view that this presumption stands indefinitely, if not permanently, and can be overcome by the accused only when he affirmatively shows some disposition of the property by him subsequent to the turnover proceedings. We do not believe these views are required by *Oriel* v. *Russell,* 278 U. S. 358, despite some conflicting statements in the opinion,

which the Court of Appeals construed as compelling affirmance of the contempt decree.

This Court said in the *Oriel* case that "a motion to commit the bankrupt for failure to obey an order of the Court to turn over to the receiver in bankruptcy the property of the bankrupt is a civil contempt and is to be treated as a mere step in the proceedings to administer the assets of the bankrupt as provided by law, and in aid of the seizure of those assets and their proper distribution. While in a sense they are punitive, they are not mere punishment— they are administrative but coercive, and intended to compel, against the reluctance of the bankrupt, performance by him of his lawful duty." 278 U. S. 358 at 363.

Of course, to jail one for a contempt for omitting an act he is powerless to perform would reverse this principle and make the proceeding purely punitive, to describe it charitably. At the same time, it would add nothing to the bankrupt estate. That this Court in the *Oriel* case contemplated no such result appears from language which it borrowed from a Circuit Court of Appeals opinion which, after pointing out that confinement often failed to produce the money or goods, said, " 'Where it has failed, and where a reasonable interval of time has supplied the previous defect in the evidence, and has made sufficiently certain what was doubtful before, namely, the bankrupt's inability to obey the order, he has always been released, and I need hardly say that he would always have the right to be released, as soon as the fact becomes clear that he can not obey.' " [4] Moreover, the authorities relied upon in Chief Justice Taft's opinion [5] make it clear that his decision did not contemplate that a coercive contempt order should issue when it appears that there is at that

---

[4] 278 U. S. 358, 366, quoting from *In re Epstein* (cited as *Epstein v. Steinfeld*), 206 F. 568, 570.

[5] 278 U. S. 358, 364.

time no wilful disobedience but only an incapacity to comply.[6] Indeed, the quotation from *In re Epstein*, cited *supra* (note 4), also stated at p. 569: "In the pending case,

---

[6] The late Chief Justice said ". . . the following seem to us to lay down more nearly the correct view," and cited *Toplitz* v. *Walser*, 27 F. 2d 196, a contempt case in which it is said (at p. 197) "The sole question is whether the bankrupt is presently able to comply with the turnover order previously made and, accordingly, whether he is disobeying that order . . . ."; *Epstein* v. *Steinfeld*, 210 F. 236, a turnover proceeding, in which the Court delineates both turnover and contempt procedures and states that a contempt order should not be issued unless there is present ability to comply; *Schmid* v. *Rosenthal*, 230 F. 818, a turnover case, citing *Epstein* v. *Steinfeld, supra; Frederick* v. *Silverman*, 250 F. 75, a contempt case, reciting the necessity for present ability to comply; *Reardon* v. *Pensoneau*, 18 F. 2d 244, a contempt case, holding the evidence there insufficient to establish present inability to comply; *United States ex rel. Paleais* v. *Moore*, 294 F. 852, involving a commitment for contempt, stating ". . . the court should be satisfied of the present ability of the bankrupt to comply . . . ."; *In re Frankel*, 184 F. 539, a contempt case in which the evidence was held insufficient to show present inability to comply; *Drakeford* v. *Adams*, 98 Ga. 722, 25 S. E. 833, a State contempt case requiring present ability to comply to be "clearly and satisfactorily established"; and Collier, Bankruptcy (Gilbert's ed., 1927) 652. The cumulative effect of these authorities seems clearly to be that, while a bankrupt's denial of present possession, standing alone, may not be sufficient to establish his inability to produce the property or its proceeds, if the Court is satisfied, from all the evidence properly before it, that the bankrupt has not the present ability to comply, the commitment order should not issue.

Other decisions are to the same effect. See, for example, *American Trust Co.* v. *Wallis*, 126 F. 464; *Samel* v. *Dodd*, 142 F. 68, *cert. den.* 201 U. S. 646; *In re Nisenson*, 182 F. 912; *In re Holden*, 203 F. 229, *cert. den.* 229 U. S. 621; *In re McNaught*, 225 F. 511; *Dittmar* v. *Michelson*, 281 F. 116; *In re Davison*, 143 F. 673; *In re Marks*, 176 F. 1018; *In re Elias*, 240 F. 448; *Freed* v. *Central Trust Co. of Illinois*, 215 F. 873; *In re Nevin*, 278 F. 601; *Johnson* v. *Goldstein*, 11 F. 2d 702; *In re Magen*, 14 F. 2d 469; *id.*, 18 F. 2d 288; *In re Walt*, 17 F. 2d 588; *Clark* v. *Milens*, 28 F. 2d 457; *Berkower* v. *Mielziner*, 29 F. 2d 65, *cert. den.* 279 U. S. 848;

or in any other, the court may believe the bankrupt's assertion that he is not now in possession or control of the money or the goods, and in that event the civil inquiry is at an end . . . ." [7]

The source of difficulties in these cases has been that in the two successive proceedings the same question of possession and ability to produce the goods or their proceeds is at issue, but as of different points of time. The earlier order may not be impeached, avoided or attacked in the later proceedings and no relief can be sought against its command. But when the trustee institutes the later proceeding to commit, he tenders the issue as to present wilful disobedience, against which the court is asked to direct its sanctions. The latter issue must be tried just as any other issue, and the court is entitled to consider all evidence relevant to it. The turnover order

---

*In re Tabak,* 34 F. 2d 209; *In re Weisberger,* 43 F. 2d 258. See also Collier, Bankruptcy (14th ed.) pp. 244–249; 2 *id.* pp. 535–542; 5 Remington, Bankruptcy (4th ed.) pp. 624–681; 8 C. J. S. pp. 681–686; 6 Am. Jur. § 369, pp. 752–753.

[7] Similarly, the following cases involving contempt orders for failure to pay alimony were cited (278 U. S. at 365) as illustrating rules of evidence concerning ability to comply, "much the same as are here laid down for bankruptcy": *Smiley* v. *Smiley,* 99 Wash. 577, 169 P. 962, affidavit as to lack of ability to comply being undenied, commitment for contempt by failure to pay held erroneous; *Barton* v. *Barton,* 99 Kan. 727, 163 P. 179, evidence held sufficient to justify commitment although it is said ". . . The defendant can not, of course, be committed for the failure to do something which is beyond his power. . . ."; *In re Von Gerzabek,* 58 Cal. App. 230, 208 P. 318, a showing of inability to comply said to be "the most effectual answer" to a contempt order; *Hurd* v. *Hurd,* 63 Minn. 443, 65 N. W. 728, *Heflebower* v. *Heflebower,* 102 Ohio St. 674, 133 N. E. 455, and *Fowler* v. *Fowler,* 61 Okla. 280, 161 P. 227, defendant's evidence insufficient to establish inability to comply which would have prevented commitment.

adjudges the defendant to be in possession at the date of its inquiry, but does it also cut off evidence as to non-possession at the later time? Thus, the real problem concerns the evidence admissible in the contempt proceeding. Of course we do not attempt to lay down a comprehensive or detailed set of rules on this subject. They will have to be formulated as specific and concrete cases present different aspects of the problem.

In *Oriel's* case, this Court said: ". . . on the motion for commitment the only evidence that can be considered is the evidence of something that has happened since the turnover order was made showing that since that time there has newly arisen an inability on the part of the bankrupt to comply with the turnover order." This language the Court of Appeals has construed to mean that the accused can offer no evidence to show that he does not now have the goods if that evidence, in the absence of an affirmative showing of when and how he disposed of the goods, might tend to indicate that he never had them and hence to contradict findings of the turnover order itself. We agree with the Court of Appeals that the turnover order may not be attacked in the contempt proceedings because it is *res judicata* on this issue of possession at the time as of which it speaks. But application of that rule in these civil contempt cases means only that the bankrupt, confronted by the order establishing prior possession, at a time when continuance thereof is the reasonable inference, is thereby confronted by a *prima facie* case which he can successfully meet only with a showing of present inability to comply. He cannot challenge the previous adjudication of possession, but that does not prevent him from establishing lack of present possession. Of course, if he offers no evidence as to his inability to comply with the turnover order, or stands mute, he does not meet the issue. Nor does he do so by

evidence or by his own denials which the court finds incredible in context.[8]

But the bankrupt may be permitted to deny his present possession and to give any evidence of present conditions or intervening events which corroborate him. The credibility of his denial is to be weighed in the light of his present circumstances. It is everywhere admitted that even if he is committed, he will not be held in jail forever if he does not comply. His denial of possession is given credit after demonstration that a period in prison does not produce the goods. The fact that he has been under the shadow of prison gates may be enough, coupled with his denial and the type of evidence mentioned above, to convince the court that his is not a wilful disobedience which will yield to coercion.

The trial court is obliged to weigh not merely the two facts, that a turnover order has issued and that it has not been obeyed, but all the evidence properly before it in the contempt proceeding in determining whether or not there is actually a present ability to comply and whether failure so to do constitutes deliberate defiance which a jail term will break.

This duty has nowhere been more clearly expressed than in the *Oriel* case: [9] ". . . There is a possibility, of course, of error and hardship, but the conscience of judges in weighing the evidence under a clear perception of the consequences, together with the opportunity of appeal and review, if properly taken, will restrain the courts from

---

[8] These conclusions are supported by the cases cited in the *Oriel* case as laying down "more nearly the correct view." See note 6, *supra*. Of course cases such as *Gompers* v. *United States* (233 U. S. 604), *Michaelson* v. *United States* (266 U. S. 42), *Pendergast* v. *United States* (317 U. S. 412) and *Cooke* v. *United States* (267 U. S. 517), all involving criminal contempt charges, are of no relevance here, as we deal only with civil contempts. See text, p. 10.

[9] 278 U. S. at 364.

recklessness of bankrupt's rights on the one hand and prevent the bankrupt from flouting the law on the other. . . ."

Such a careful balancing was said to be required in turnover proceedings because "coercive methods by imprisonment are probable and are foreshadowed." [10] Certainly the same considerations require as careful and conscientious weighing of the evidence relevant in the contempt proceeding. At that stage, imprisonment is not only probable and foreshadowed—it is imminent. And, without such a weighing, it becomes inevitable.

## V.

We deal here with a case in which the Court of Appeals was persuaded that the bankrupt's disobedience was not wilful. It appears, however, that the District Court did not, in the contempt proceedings, weigh and evaluate the evidence before it but felt bound almost automatically to order Maggio's commitment in deference to clear precedents established by the Court of Appeals. Moreover, the Court of Appeals affirmed the commitment order although it was convinced that Maggio was not deliberately disobeying but had established his contention that he was unable to comply. On such findings the *Oriel* case would require Maggio's discharge even if he were already in jail. It is hardly consistent with that case, or with good judicial administration, to order his commitment on findings that require his immediate release.

When such a misapprehension of the law has led both courts below to adjudicate rights without considering essential facts in the light of the controlling law, this Court will vacate the judgments and remand the case to the District Court for further proceedings consistent with the principles laid down in this Court's opinion. *Manu-*

---

[10] 278 U. S. at 363.

*facturers' Finance Co.* v. *McKey,* 294 U. S. 442, 453, *Gerdes* v. *Lustgarten,* 266 U. S. 321, 327, and cases cited.[11] That practice is appropriate in this case in view of what has been said herein concerning the judgments below.

*Vacated and remanded.*

Separate opinion of MR. JUSTICE BLACK, in which MR. JUSTICE RUTLEDGE concurs.

August 9, 1943, the referee in bankruptcy found that petitioner had possession of certain merchandise belonging to a bankrupt corporation and ordered him to turn it or the proceeds over to the bankruptcy trustee. In these contempt proceedings (April 18, 1945) the District Court found that petitioner had failed to prove he no longer had possession of the property, and ordered him to be held in jail until he delivered the property or its proceeds to the trustee.

Had the petitioner been charged with embezzling this same property after the 1943 turnover order, doubtless no one would even argue that a doctrine of res judicata barred him from introducing evidence to show that the turnover findings of possession were wrong, and that in truth he did not have possession of the property or its proceeds either on, before, or after August 9, 1943, or April 18, 1945. One basic reason why the findings of fact in a turnover proceeding would not be res judicata in an embezzlement proceeding is that the burden of proof is different in the two types of proceedings. In the first, a turnover proceeding, "clear and convincing proof" is enough; in the second, embezzlement, "proof beyond a reasonable doubt" is required. The burden of proof is

---

[11] *Cf. Kay* v. *United States,* 303 U. S. 1, 10; *Prairie Farmer Publishing Co.* v. *Indiana Farmer's Pub. Co.,* 299 U. S. 156, 159; *Buzynski* v. *Luckenbach S. S. Co.,* 277 U. S. 226, 228.

heavier in the embezzlement case because a judgment of conviction may embody a criminal punishment, while a turnover judgment does not—it is merely an order for the surrender of property, similar to an order of delivery in a replevin suit.

There is no such reason for different measurements of proof in contempt and embezzlement cases; consequentially, the two are almost identical. Fine, imprisonment, or both can result from a conviction of either. Here if this contempt judgment is carried out against the petitioner, he might be compelled to remain in prison longer than he would had he been convicted and sentenced on a charge of embezzlement. It is true that, if the court was correct in finding that petitioner had possession of the property or its proceeds (and if he still has it), he carries the keys of the jail in his pocket, because he can turn the property or proceeds over to the trustee at any time and thus get his freedom. The crucial question to petitioner in this contempt proceeding was whether he had possession of the property or its proceeds June 5, 1945. And that crucial question was decided against petitioner by the trial court without holding that the evidence was sufficient to prove beyond a reasonable doubt that petitioner still had possession of the property.

I am unwilling to agree to application of a doctrine of res judicata that results in sending people to jail for contempt of court upon a measure of proof substantially the same as that which would support the rendition of a civil judgment for the plaintiff on a promissory note, an open account, or some other debt. All court proceedings, whether designated as civil or criminal contempt of court or given some other name, which may result in fine, prison sentences, or both, should in my judgment require the same measure of proof, and that measure should be proof beyond a reasonable doubt. See *Gompers* v. *United*

*States*, 233 U. S. 604, 610–611; *Michaelson* v. *United States*, 266 U. S. 42, 66–67; *Pendergast* v. *United States*, 317 U. S. 412, 417–418.

The foregoing is written on the assumption that the turnover-contempt procedure is legal, an assumption which I do not accept. I share the opinion of the Circuit Court of Appeals that this procedure is unauthorized by statute and that it should not be permitted to take the place of criminal prosecutions for fraud as apparently was done here.[1] This whole procedure savors too much of the old discredited practice of imprisonment for debts—debts which people are unable to pay. For here, if petitioner did wrongfully dispose of the property, whether or not he was guilty of a crime, he was probably liable in some sort of civil action, basically similar to, if not actually, one for debt. Had a judgment been obtained against him in such a civil case, I doubt if it would be thought at this period that the bankruptcy court could have thrown petitioner in jail for his failure to obey what would have been in effect a court order to pay the debt embodied in the judgment.

Furthermore, the finding of possession of the merchandise as of 1943 may rest on an evidential foundation firm enough to support a civil turnover order but it is too shaky to support a sentence to prison. Accepting that

---

[1] "We would hold that a *turnover proceeding may not, via a fiction, be substituted for a criminal prosecution so as to deprive a man of a basic constitutional right, the right of trial by jury.* We would note, too, that one consequence of the fiction is that the respondent may be twice punished for the same offense, since, if he is later indicted for violation of 11 U. S. C. A. § 52 (b), his imprisonment for contempt will not serve as a defense. We would add that nowhere in the Bankruptcy Act has Congress even intimated an intention to authorize such results, and that they stem solely from a judge-made gloss on the statute." *In re Luma Camera Service*, 157 F. 2d 951, 953–954.

finding, however, the presumption of present or 1945 possession from the possible 1941 or 1943 possession achieves a procedural result which runs counter to basic practices in our system of laws. For as the District Court said, it gave the prosecution the advantage of a "presumption" which, of itself, was held to relieve it from offering further proof of petitioner's guilt in a case where forfeiture of his personal liberty and property was sought; it threw upon the petitioner the burden of proving his innocence.[2]

For the foregoing reasons, among others, I would reverse the judgment of the Circuit Court of Appeals, with directions that the petitioner be released and that no further contempt proceedings be instituted against him based on his refusal to obey the turnover order.

MR. JUSTICE FRANKFURTER, dissenting.

This is one of those rare cases where I find myself in substantial agreement with the direction and main views of an opinion, but am thereby led to a different conclusion. Too often we are called upon to disentangle a snarled skein of facts into a thread of legal principles. In this case, the Court's opinion seems to me to snarl a straight thread of facts into a confusing skein of legal principles. It was the record in a prior case involving the same litigants that invited correction of a rule of bankruptcy administration in the Second Circuit. We denied review.[1]

---

[2] In holding petitioner in contempt, the District Court said: "Respondent has not sustained his burden of satisfactorily accounting for the disposition of the assets by his mere denial of possession under oath." It then made the following finding of fact: "4. The respondent, Joseph F. Maggio, has wholly failed to comply with said turnover order, and he has failed to explain to the satisfaction of this court his failure to comply."

[1] 324 U. S. 841.

The record in this case precludes such correction, but the Court's opinion is an effort to whip the devil round the stump.

The precise question before us may be simply stated. The District Court ordered the bankrupt to turn over goods withheld by him from the trustee. On the basis of two prior cases,[2] the Circuit Court of Appeals affirmed this order, *per curiam.* 145 F. 2d 241. These earlier cases in turn relied on a previous case.[3] All three enforced a rule of the Second Circuit that goods in the possession of a bankrupt on the day of bankruptcy are presumed to continue in his possession regardless of the time that may have elapsed. In all three cases, the Circuit Court of Appeals had affirmed the turnover orders although it was maintained that the bankrupts could not obey them.[4] Likewise, in all three cases, that court had declared its impotence to change what it regarded as an untenable rule of bankruptcy administration, although fashioned by it and not by this Court.[5] In almost imprecating language review and reversal by this Court in these cases were invited.[6] In one of these cases, the bankrupt filed a petition

---

[2] *Robbins* v. *Gottbetter,* 134 F. 2d 843, and *Cohen* v. *Jeskowitz,* 144 F. 2d 39.

[3] *Seligson* v. *Goldsmith,* 128 F. 2d 977.

[4] *Seligson* v. *Goldsmith,* 128 F. 2d 977, 978–79; *Robbins* v. *Gottbetter,* 134 F. 2d 843, 844; *Cohen* v. *Jeskowitz,* 144 F. 2d 39, 41 (concurring opinion of Frank, J.).

[5] Presumably, this avowed inability of the Circuit Court of Appeals for the Second Circuit to free itself from its own prior decision in this situation is not the reflection of a principle similar to that which binds the House of Lords to its past precedents. It must be attributable to the fact that the Second Circuit has six circuit judges who never sit *en banc* and that presumably they deem it undesirable for the majority of one panel to have a different view from that of a majority of another panel.

[6] 128 F. 2d at 979; 134 F. 2d at 844; 144 F. 2d at 40–41.

for certiorari, which this Court denied.[7] Then came the prior case involving the litigants now before us, with this Court's refusal to review the turnover order. To be sure, the denial of a petition for certiorari carries no substantive implications. Reference to it here is relevant as proof of the finality with which the turnover order, as affirmed by the Circuit Court of Appeals, was invested.

In *Oriel* v. *Russell*, 278 U. S. 358, a unanimous bench, including in its membership judges of wide experience with bankruptcy law,[8] held that upon a citation for contempt to compel obedience of a turnover order the issues adjudicated by that order could not be relitigated. That case decided nothing if it did not decide that what the turnover order adjudicated—that the bankrupt withheld certain property from the bankrupt estate and was still in control of this property on the day he was ordered to turn it over—is the definitive starting point for contempt proceedings to exact obedience to the turnover order. In short, the contempt proceedings must proceed from the turnover order and cannot go behind it. We should not ignore this relevant sentence in *Oriel* v. *Russell:* "Thereafter on the motion for commitment the only evidence that can be considered is the evidence of something that has happened since the turnover order was made showing that since that time there has newly arisen an inability on the part of the bankrupt to comply with the turnover order." [9]

---

[7] In the first two of these cases, the bankrupt did not seek review in this Court; in the *Jeskowitz* case, the bankrupt took the hint, but this Court denied certiorari. 323 U. S. 787.

[8] Judge A. N. Hand's observation concurring, in the *Robbins* case, 134 F. 2d at 845, is also pertinent: ". . . all the justices of a court of which those exceptionally alert guardians of civil rights, Justices Holmes, Brandeis and Stone, were members, unanimously concurred in the opinion of Chief Justice Taft . . . ."

[9] 278 U. S. at 363.

The Court today reaffirms *Oriel* v. *Russell*. At the same time it makes inroad on the practical application of *Oriel* v. *Russell*. On virtually an identical record[10] it reverses where *Oriel* v. *Russell* affirmed. The nature and scope of the inroad are uncertain because the Court's opinion, to the best of my understanding, leaves undefined how the District Court is to respect both *Oriel* v. *Russell* and today's decision.

About some aspects of our problem there ought to be no dispute. We are all agreed that while the bankrupt cannot relitigate the determination of a turnover order that he had such and such goods on the day of the order, he can avoid the duty of obedience to that order if he "can show a change of situation after the turnover order relieving him from compliance."[11] The right to be relieved from obeying the turnover order by sustaining the burden of inability to perform, on proof of circumstances not questioning the turnover order, has never been disputed. Again, if a judgment of civil contempt is rendered and the bankrupt is sent to jail until he chooses to obey the court's command, he will not be kept there when keeping him no longer gives promise of performance. *Oriel* v. *Russell* so pronounced.[12]

And so, since the fact that the bankrupt had possession of the goods on the day of the turnover order is a fact

---

[10] See Appendix.

[11] 278 U. S. at 364.

[12] " 'I have known a brief confinement to produce the money promptly, thus justifying the court's incredulity, and I have also known it to fail. Where it has failed, and where a reasonable interval of time has supplied the previous defect in the evidence, and has made sufficiently certain what was doubtful before, namely, the bankrupt's inability to obey the order, he has always been released, and I need hardly say that he would always have the right to be released, as soon as the fact becomes clear that he can not obey.' " 278 U. S. at 366, quoting from Judge McPherson's opinion in *In re Epstein*, 206 F. 568, 570.

that cannot be controverted or relitigated because his possession of the goods on that day was the very thing adjudicated, the case reduces itself to this simple question: Where, on failure to obey the turnover order, the bankrupt stands mute, offers no evidence as to a change of circumstances since the order or offers evidence of a kind which the District Court may justifiably disbelieve, has he met his burden of proof so as to preclude the District Court from enforcing obedience by commitment for civil contempt?

On the record and the findings of the District Court this is the precise question now presented. There is nothing else in the record, except Judge Frank's statement below that the bankrupt was ordered to perform although the court knew that it was impossible for him to perform.[13] But this assertion of "impossibility" was not derived from the record in these contempt proceedings. It derives from Judge Frank's familiar hostility to what he deems the unfairness of his court's rule of presumption in ordering turnover.[14] Judge Frank here merely repeats his conviction that a turnover order like that rendered against Maggio is an order to turn over goods which could not be

---

[13] "Although we know that Maggio cannot comply with the order, we must keep a straight face and pretend that he can, and must *thus* affirm orders which first direct Maggio 'to do an impossibility, and then punish him for refusal to perform it.'" 157 F. 2d at 955 (italics supplied). Judge Frank made this statement concerning the presumption of continued possession in turnover order proceedings, and was not addressing his remarks to the record before him in the contempt proceeding. The dictum began with this sentence: "Were this a case of first impression involving the validity of a turnover order, we would not accept such reasoning." 157 F. 2d 951, 953. The "thus" in his statement indicates hostility to the basis of the turnover order because of a virus which the lower court feels unable to extract but which automatically infects the contempt proceedings.

[14] "With the turnover order once sustained, the contempt order necessarily followed." *Id.* at 954.

turned over. But that was water over the dam in the contempt proceeding. To give it legal significance when enforcement of the turnover order is in issue is to utter contradictory things from the two corners of the mouth. It is saying that the turnover order cannot be relitigated— that we cannot go back on the adjudication that the bankrupt had the goods at the time he was ordered to turn them over—but we know he did not have the goods, so we contradict the turnover order and do not respect it as *res judicata.*

I cannot reconcile myself to saying that we adhere to *Oriel* v. *Russell* and yet reject its only meaning, namely, that we cannot go behind the judicial determination made by the turnover order that the bankrupt on such and such a day had the enumerated goods. Moreover, the authorities relied upon in Chief Justice Taft's opinion [15] make it clear that his decision *did* contemplate that a coercive contempt order should issue when it appears that the bankrupt has introduced no evidence or, what is the same, evidence that may properly not satisfy the District Court by establishing incapacity to comply since the turnover order.[16] In this case, the District Court was

---

[15] 278 U. S. 358, 364.

[16] The Chief Justice said ". . . the following seem to us to lay down more nearly the correct view," and cited *Toplitz* v. *Walser*, 27 F. 2d 196, a Third Circuit contempt case in which it is said (at p. 197) "It therefore devolves upon the bankrupt in the latter [contempt] proceeding to show how and when the property previously adjudged in his possession or control had passed out of his possession or control . . . . The trouble with the evidence in the contempt proceeding, the only evidence properly here for review, is that it is directed to the issue of the bankrupt's possession and control of property at the date of bankruptcy raised and definitely decided against her in the turnover proceeding . . . . Though not in form this is in substance a collateral attack upon the now finally established turnover order, which of course is not permissible."; *Epstein* v. *Steinfeld*, 210 F. 236, a turnover proceeding, in which the Third Circuit delineated its procedure, different from that followed in the Second Circuit,

entirely warranted in finding that the bankrupt had pro-
duced no evidence to contradict the adjudication of the
turnover order that he had the goods when he was told to

whereby if the referee found a shortage at the time of bankruptcy
the turnover order was automatically entered, and the question of
present possession or ability to comply with that order was left
open for possible contempt proceedings, the presumption of con-
tinued possession being applied in such proceedings since the bank-
rupt had to show that by reason of events occurring since the bank-
ruptcy he was unable to comply (cf. *In re Eisenberg,* 130 F. 2d 160)
(this distinction has no real bearing on the instant issue as to
either collateral attack or the presumption of continued possession);
*Schmid* v. *Rosenthal,* 230 F. 818, a Third Circuit turnover case,
citing *Epstein* v. *Steinfeld, supra; Frederick* v. *Silverman,* 250 F.
75, a Third Circuit contempt case citing *Epstein* v. *Steinfeld, supra;
Reardon* v. *Pensoneau,* 18 F. 2d 244, an Eighth Circuit contempt
case, holding that the bankrupt had not met his burden of establish-
ing present inability to comply, in which it is said (at pp. 245–46)
"They [turnover orders] establish the bankrupt's possession and
control on the day the referee's order was made. The burden was
on him to show what disposition had been made of the $6,900.
Until that showing is made relieving him of an intentional loss of its
possession and control, it must be presumed that he still has it. . . .
a bankrupt cannot escape an order for the surrender of property
belonging to his estate 'by simply denying under oath that he has
it.' "; *United States ex rel. Paleais* v. *Moore,* 294 F. 852, a Second
Circuit *habeas corpus* case following a commitment for contempt,
stating (at p. 857) "If, at the time the turn-over order was made,
the books and papers were in the bankrupt's hands, the presumption
is that they continued to be in his possession or under his control
until he has satisfactorily accounted to the court of bankruptcy for
their subsequent disposition or disappearance. The burden is upon
him satisfactorily to so account for them. He cannot escape an
order for their surrender by simply denying under oath that he
no longer has them."; *In re Frankel,* 184 F. 539, a contempt case
in which L. Hand, then a District Judge, refused to commit for
contempt because he did not deem the turnover order binding as
*res judicata,* but on rehearing reversed himself, holding that the
bankrupt could not show present inability by evidence constituting
an indirect attack on the turnover order, stating (at p. 542) "There-
fore, in so far as the [turnover] order directs anyone to do anything,

turn them over, unless, in place of what is usually deemed evidence, an infirmity has been found to seep, by a process of osmosis, into the turnover order respect for which in its entirety is the starting point of our problem.

The time to have acted on the inference of impossibility of performance of the turnover order, or to have taken notice of the imprisoning rule of the Second Circuit as to the presumption of continued possession of a bankrupt's withheld goods, was when we were asked to review the Circuit Court of Appeals' denigrating affirmance of the turnover order.[17] When we declined to review that turn-

---

he may not in the contempt proceeding question the propriety of the direction; and in so far as the order determines an existing fact, which is necessary in law to the validity of the direction, he may not question its truth. To question such a fact is to question the validity of the direction which depends upon it, and is only an indirect way of reviewing the order. Therefore now to deny the fact that the bankrupt had the money in his possession is in this case to assert that the order directing him to pay it over was erroneous. On this account, therefore, that fact is concluded, once it be granted that it was necessary to the validity of the order, which I have shown. Quite reluctantly, therefore, I can only conclude that I was wrong originally to inquire into the merits, and that a committal must issue." The cumulative effect of these authorities is that a bankrupt's denial of present possession, standing alone, is not sufficient to establish his inability to produce the property or its proceeds, and that the bankruptcy court will not permit the bankrupt to prove present inability to comply with the turnover order by evidence which indirectly constitutes a collateral attack on that order.

[17] For almost forty years, the Second Circuit has tenaciously abided by the presumption of continued possession. While this presumption was previously *sub silentio* utilized (*e. g., In re Schlesinger*, 102 F. 117, affirming 97 F. 930), *In re Stavrahn* in 1909, 174 F. 330, appears to have been the Second Circuit's case of first impression, and the decision that sired the presumption. There the court stated that the bankrupt could not defend against a contempt citation following a turnover order on the assertion that he had

over order, it became a final and binding adjudication. Neither court below was under a misapprehension as to the applicable law in the instant contempt proceeding. The District Court relied on *In re Siegler,* 31 F. 2d 972. But surely reliance on a case that was correctly decided is hardly an indication of misapprehension of law. If the *Siegler* decision had preceded instead of followed [18] *Oriel* v. *Russell,* it might well have been one of the authorities relied upon in Chief Justice Taft's opinion.[19] Nor do we have to speculate as to whether Judge Frank's conclusion that Maggio was unable to comply was based on evidence in this record or on doubt as to the propriety of the turnover order. We have the same printed record before us that he had and it is barren of such evidence. Presum-

---

never taken the assets in question, but had to come forward with some reasonable explanation as to what had become of the assets since the turnover order. In 1912, the Second Circuit reiterated the reasoning of its earlier decision in *In re Weber Co.,* 200 F. 404. The presumption had been somewhat inarticulately phrased in the earlier opinion, and the court in this case commended the District Judge for aptly carrying out the mandate of the *Stavrahn* decision. The cases up to 1925 and before the *Oriel* case are listed and discussed at length in *In re H. Magen Co.,* 10 F. 2d 91, in which the court observed that "The law relating to turn-over orders is pretty well established in this circuit." 10 F. 2d at 93. *In re Siegler,* note 18 *supra,* was decided three months after this Court's decision in the *Oriel* case. Then came: *Danish* v. *Sofranski,* 93 F. 2d 424; *In re Pinsky-Lapin & Co.,* 98 F. 2d 776; *Seligson* v. *Goldsmith,* note 3 *supra; Robbins* v. *Gottbetter,* note 2 *supra; Cohen* v. *Jeskowitz,* note 2 *supra;* and the *per curiam* affirmance of the turnover order in the instant bankruptcy proceedings.

[18] "Any difference of opinion respecting the force and effect of a turnover order, which may have prevailed before the decision of the Supreme Court, in Prela v. Hubshman [companion case to *Oriel* v. *Russell*] . . . is now out of place in any discussion of the subject." 31 F. 2d at 973.

[19] Cf. *In re Frankel,* note 16 *supra.*

ably Judge Frank did not travel outside this record and act on undisclosed private knowledge. The whole course of this issue in the Second Circuit in recent years makes it obvious that his observation was merely another animadversion on that Circuit's practice in issuing turnover orders. The Circuit Court of Appeals did not purport to make an independent evaluation of Maggio's evidence bearing on his incapacity to obey the turnover order. It was beyond its power to do so. The Circuit Court was not at large. Its power was limited to a consideration of the justifiability of the District Court's findings on the basis of the record before that court.

The cure for this procedural situation, if cure is called for, is correction of the rule of the Second Circuit regarding presumptions in turnover orders.[20] It ought not to be dealt with indirectly and at the cost of beclouding the doctrine of *res judicata* in proceedings for civil contempt. If Maggio has become the unhappy victim of the procedural snarl into which the Circuit Court of Appeals for the Second Circuit has involved itself by its decisions on the appeals of turnover orders and by this Court's refusal to review such adjudications, the law is not without ample remedies. The District Court has power to discharge a contemnor when confinement has become futile, or release may be had through use of *habeas corpus,* which, in the now classic language of Mr. Justice Holmes, "cuts through all forms and goes to the very tissue of the structure. It comes in from the outside, not in subordination to the proceedings . . . ." *Frank* v. *Mangum,* 237 U. S. 309, 346. These are means available to correct whatever specific hardship this case may present without generating cloudiness indeterminate in range upon a legal principle of such social significance as that of *res judicata* and upon

---

[20] Cf. *Brune* v. *Fraidin,* 149 F. 2d 325.

a remedy so vital as civil contempt for the sturdy administration of justice.

How is the conscientious District Court to carry out the directions conveyed by the Court's opinion? If the District Court gives unquestioned respect, as it is told to do, to the turnover order of August 9, 1943, it will start with the fact that on August 9, 1943, the bankrupt was able to comply with that order. With that as a starting-point, will the District Court not be entitled to find again, as it has already found,[21] that nothing presented by the bankrupt in exculpation for not complying with the turnover order disproves that he continued to have the property, which he was found to have had as of August 9, 1943? If the District Court should so find, would not the Circuit Court of Appeals and this Court, if the case came here for review, be duty bound to hold that, on the basis of the situation as adjudicated by the turnover order, the District Court could reasonably make such a finding? Or is the District Court to infer that in view of the snarl into which these proceedings have got by reason of the failure to upset the turnover order when directly under review, this Court was indulging in benign judicial winking—that while the fact of the possession of the property had been adjudicated by the turnover order and could not verbally be questioned, the District Court need not accept the determination of that order as facts? But if the District

---

[21] In the opinion dated April 18, 1945, holding petitioner in contempt of court, the District Court stated that: "Respondent [petitioner here] has not sustained his burden of satisfactorily accounting for the disposition of the assets by his mere denial of possession under oath." And that court's fourth finding of fact was as follows: "The respondent, Joseph F. Maggio, has wholly failed to comply with said turnover order, and he has failed to explain to the satisfaction of this court his failure to comply."

Court may so drain the adjudication of the turnover order of its only legal significance, why assert that *Oriel* v. *Russell* is left without a scratch? Why reaffirm that an adjudication sustaining a turnover order may not be re-litigated when obedience is sought to such turnover order? These are questions which will confront not merely the district judge to whom this case will be remanded. After all, we are concerned with the practical administration of the Bankruptcy Act by district judges all over the United States.

By abstaining from expressing views regarding the requisites of a turnover order, I mean neither to agree nor disagree with observations made by the Court. There has been opportunity in the past for adjudication of that matter, and there may be such an opportunity in the future. This case does not present it. From all of which I conclude that the judgment below should be affirmed, leaving for another day, when the occasion makes it appropriate, to consider directly and explicitly the principle that should govern the issue of turnover orders by bankruptcy courts.[22]

---

[22] "The proceedings in these two cases have been so long drawn out by efforts on the part of the bankrupts to retry the issue presented on the motion to turn over as to be, of themselves, convincing argument that if the bankruptcy statute is not to be frittered away in constant delays and failures of enforcement of lawful orders, the rule we have laid down is the proper one." 278 U. S. at 363.

Comparison between *Maggio* v. *Zeitz* and *Prela* v. *Hubshman* (companion case to *Oriel* v. *Russell*), 278 U. S. 358

| | Identities | | Differences | |
|---|---|---|---|---|
| | Maggio | Prela | Maggio | Prela |
| Name of bankrupt. | | | Joseph Maggio (R. cover). | Samuel Prela (R. cover). |
| Name of trustee. | | | Raymond Zeitz (R. cover). | Louis Hubshman (R. cover). |
| Type of property. | | | Photographic equipment (R. 2). | Silk (R. 1). |
| Date of proven possession. | | | Before Jan. 1, 1942 (324 U. S. 841, R. 13). | Before Nov. 22, 1924 (R. 1). |
| Date of petition in bankruptcy. | | | Apr. 14, 1942 (324 U. S. 841, R. 4). | Nov. 22, 1924 (R. 1). |
| Date of petition for turnover. | | | Jan. 7, 1943 (324 U. S. 841, R. 8). | July 1, 1925 (R. 5). |
| Interval between petition in bankruptcy and petition for turnover. | Eight months more or less. | | | |
| Trustee's proof of possession in bankrupt. | Examination of Maggio's inventories revealed discrepancies between sales and stock on hand at close of last inventory (324 U. S. 841, R. 7). | Prela manufactured blouses from silk; each blouse required 1½ yards of silk; examination of Prela's books revealed discrepancy between blouses manufactured and silk on hand (R. 1). | | |
| Bankrupt's reply to above proof. | 1. Inventory figures erroneous (unrecorded sales) (324 U. S. 841, R. 53-61). 2. Denial of present possession of the property. (*Id.* at 62.) | 1. Assumption from books erroneous—manufactured a kind of blouse that required more than 1½ yards of silk (R. 2, 19). 2. Denial of present possession of the property. (*Ibid.*) | | |
| District court's ruling on evidence. | 1. Assumptions as to past possession correct. 2. Bankrupt's denial of present possession disbelieved. (324 U. S. 841, R. 111.) | (R. 1, 5.) | | |
| Date of turnover order. | | | Aug. 9, 1943 (R. 5). | July 8, 1926 (R. 3). |
| Interval between dates of proven possession and turnover order. | 20 months more or less. | | | |
| Review of turnover order. | Unanimously affirmed by CCA 2 without opinion. L. Hand, Swan, and Clark, J. J., on Oct. 25, 1944 (145 F. 2d 241). | Hough, Mack, and L. Hand, J. J., on Dec. 13, 1926 (unreported) (R. 15). | Cert. denied Feb. 5, 1945, 324 U. S. 841. | |
| Date of trustee's petition for contempt citation. | | | Dec. 7, 1944 (R. 3). | April 22, 1927 (R. 13). |
| Trustee's proof of contempt. | 1. Turnover order. 2. Failure to comply. (R. 16.) | (R. 13, 15.) | | |
| Bankrupt's reply to above proof. | 1. Did not have possession on date of turnover order. 2. Hasn't got it now. 3. Has become physically incapacitated. (R. 13, 17.) | (R. 17.) | 3 (a). Heart trouble (R. 15). 4. Merely repeated denial (R. 13, 17). | 3 (a). Paralytic stroke (R. 24). (b) Wife sick, too. (*Ibid.*, 25.) 4. Filed affidavits of former cutter, salesman, and blouse buyers to the effect that blouses in question used 2 and more yards of silk (R. 27, 28, 29). |
| District court's ruling on evidence. | 1. Trustee makes out *prima facie* case by proof of non-compliance with turnover order. 2. Turnover order cannot be collaterally attacked by proving that bankrupt disposed of property prior to date of order to show present inability to comply with order. 3. To avoid contempt, bankrupt must prove present inability to comply by proof of disposition of property subsequent to turnover order. 4. Bankrupt makes no claim that he has disposed of the property since the turnover order. (R. 18, 19.) (R. 48, 52.) 5. Physical incapacity of bankrupt and/or bankrupt's wife ignored. | | 6. Bankrupt's bare denial of present inability to comply with turnover disbelieved (R. 19). | 6. Bankrupt's evidence and that of other witnesses that as a matter of fact bankrupt disposed of silk prior to turnover order excluded and/or stricken (R. 33-34, 45-46, 50, 54). |
| Date of contempt citation. | | | Apr. 18, 1945 (R. 19). | Sept. 9, 1927 (R. 52). |
| Interval between date of turnover order and date of contempt citation. | 20 months. | 14 months. | Certiorari to review turnover order applied for, opposed, and denied. | Certiorari to review turnover order not sought. |
| Review of contempt citation by CCA 2. | Affirmed. 157 F. 2d 951. 1. "With the turnover order once sustained, the contempt order necessarily followed." Citing the *Oriel* case (at p. 954). 2. Findings in the turnover order proceeding are res judicata in the contempt proceeding. (*Ibid.*) 3. "That is to say" the district court "had to accept it as true" that Maggio had possession on the date of the turnover order and that "this possession continued ... unless Maggio showed that, since August 9, 1943, he had been deprived of that possession or had in some other way become unable to comply with the turnover order." (*Ibid.*) 4. "As Maggio made no such showing of an intervening change of facts, there was no error in the entry of the contempt order." (*Ibid.*) | 23 F. 2d 413. 1. "A disobedience of the order to turn over presents a prima facie case of contumacy for punishment." Citing the CCA *Oriel* case (at p. 414). 3. "Having been directed to turn over property, it is presumed that the offender continues in his willful and deliberate conduct when he fails to obey the order." (*Ibid.*) 4. "No evidence was offered by the bankrupt to show what he had done with the property since he was adjudged a bankrupt" (at p. 413). 5. Physical incapacity of bankrupt and/or bankrupt's wife treated as irrelevant. | Frank and L. Hand, J. J., with Swan, J. (concurring in the result). 3 (a). "Although we *know* that Maggio cannot comply with the order, we must keep a straight face and pretend that he can ..." (at pp. 954-5). (Italics supplied.) | Manton and Swan, J. J., with L. Hand, J., dissenting. |