In the Matter of A. Edward **HARNIK** and Pauline Harnik, d/b/a **Edward's** Art Gallery, and A. Edward **Harnik,** and Pauline Harnik.

Nos. 45, 44, 46.

United States District Court
W. D. Arkansas,
Hot Springs Division.
May 17, 1957.

Richard W. Hobbs, Hot Springs, Ark., for petitioner.

D. D. Panich, Little Rock, Ark., R. Julian Glover, Hot Springs, Ark., for respondent.

JOHN E. MILLER, District Judge.

A. Edward Harnik on March 30, 1957, filed his petition for review of an order of the Referee entered on March 26, 1957, requiring the bankrupt to turn

over to the Referee in Bankruptcy the sum of $6,127. The question for determination is whether the Referee, under the evidence reflected by the record, was justified in entering the turnover order.

On April 27, 1956, A. Edward Harnik in Bankruptcy Action No. 44, Pauline Harnik in Bankruptcy Action No. 46, and A. Edward Harnik and Pauline Harnik, d/b/a Edward's Art Gallery, in Bankruptcy Action No. 45, were duly adjudged bankrupt on voluntary petitions filed by them on the same date, April 27, 1956. On May 18, 1956, Sigun Rasmussen was appointed Trustee and duly qualified as Trustee for each bankrupt estate.

Prior to the filing of the petition for adjudication of bankruptcy, A. Edward Harnik was the owner and holder of a lease agreement dated July 8, 1954, effective as of July 1, 1954, in which the Rector Trust Estate leased to the said Harnik the premises occupied by the bankrupts located at 316–318 Central Avenue, Hot Springs, Arkansas, for a term of years which was to have expired on December 31, 1956. The monthly rental to be paid for the premises was $650 per month, and under the lease agreement the lessee, A. Edward Harnik, was required to and did deposit with the lessor the sum of $7,800, which was to be held by the lessor as a guaranty for the payment of the rent which would accrue for the calendar year 1956.

On April 3, 1956, the lessor elected to cancel the lease agreement because of the insolvency of the said A. Edward Harnik. The next day the attorneys for the lessor delivered to the bankrupt, A. Edward Harnik, a cashier's check for $6,127 representing the balance on deposit with the lessor as prepaid rent to April 15, 1956, and being the remainder of the said $7,800 after deducting the amount of the rent which was in arrears under the terms of the lease agreement.

On April 5, the next day after the bankrupt received the check from the attorneys for the lessors, he cashed the check and received $6,127 in money.

On February 11, 1957, the Trustee filed his petition for a turnover order, in which he alleged that on April 5, 1956, when the bankrupt received the sum of $6,127, that he was insolvent and had in contemplation the filing of the voluntary petition for adjudication as a bankrupt; that at the time of filing said petition for adjudication the bankrupt "either had the said sum of $6,127 in cash in his possession or in the possession of other persons unknown to petitioner who held the same as agent for the said bankrupt; that demand has been made upon the said A. Edward Harnik for payment and delivery of said sum of $6,127 to petitioner and the said demand has been refused, * * * that the said sum of $6,127 in cash is a part of the assets of the said A. Edward Harnik, bankrupt; that the said A. Edward Harnik, bankrupt, has filed schedules in bankruptcy herein showing liabilities far in excess of any assets delivered over to petitioner; that the said A. Edward Harnik, bankrupt, wrongfully retains possession of said sum of $6,127 cash without right or title thereto".

Upon the filing of the petition, the Referee entered an order requiring the bankrupt, A. Edward Harnik, to appear in the Circuit Courtroom of the Garland County Court House in the City of Hot Springs, Arkansas, on February 25, 1957, at 10 o'clock a. m., and show cause why an order should not be entered requiring him to turn over to the Trustee in bankruptcy the said sum of $6,127.

On the date fixed for the hearing on the petition the Trustee appeared in person and by his attorney, certain creditors were represented by their attorney, and the bankrupt, A. Edward Harnik, appeared in person and by his attorney. At the beginning of the hearing the attorney for the bankrupt stated that he had not had an opportunity to respond to the petition, and asked and was granted permission to dictate into

the record the response of the bankrupt. The response as dictated is as follows:

"(1) That at an examination of the bankrupt, A. Edward Harnik, held before the Referee in Bankruptcy, the said A. Edward Harnik did testify to receiving the monies set forth in the petition and further testified as to his disposal of said sums subsequent to that time; that a full opportunity was given all parties to question the bankrupt at the said hearing and the parties present did avail themselves of that opportunity.

"(2) That an action was filed in the United States District Court for the Western District of Arkansas, Hot Springs Division, on the 28th of June, 1956, by Sigun Rasmussen, as Trustee in the above bankrupt matter, naming Charles Weaver, Veit Hain, Henry Rector, Jr., and the Rector Trust Estate as defendants therein; that that action is still pending in the said court and that the action asks for the return of the same sum from the defendants therein as is asked of the bankrupt, A. Edward Harnik, in the present action before the Referee.

"Having fully answered the petition for the turnover order and the order issued by the Referee, the said bankrupts pray that the petition be dismissed and the order rescinded.

(The suit referred to in paragraph numbered 2 above was dismissed by the Trustee on the 22nd day of March, 1957.)

Following the conclusion of the hearing on the petition and the response, and while the issues were under consideration by the Referee, the bankrupt filed a motion asking permission to file as evidence four affidavits executed by four individuals in which each of them stated that the bankrupt had the reputation of being a very extensive gambler; that he gambled heavily on everything from baseball games to horse races, and that it was not unusual for him to place bets of $1,000 on a single horse race or ball game; that the bankrupt had lost several fortunes in his gambling activities over the past years; that he gambled large sums of money even when he could not afford to do so. These affidavits were received and considered by the Referee along with all the other testimony. The Referee has included the affidavits in his certificate and also a transcript of the ore tenus testimony adduced at the hearing on the petition, and in the turnover order the Referee included his findings of fact and conclusions of law, as follows:

"1. That on or about April 3, 1956, the Rector Trust Estate notified A. Edward Harnik it had elected to cancel a lease then outstanding covering the premises occupied by the bankrupt company because of Harnik's insolvency.

"2. On or about April 3, 1956, the Rector Trust Estate delivered to Harnik or his attorneys, cashier's check No. 193624, dated April 3, 1956, issued by the Arkansas Trust Company, and payable to A. Edward Harnik in the sum of $6,127.00.

"3. That the said A. Edward Harnik cashed the aforesaid cashier's check at the Arkansas Trust Company on or about April 5, 1956, and secured the sum of $6,127.00 in cash, that this cash money was not deposited in any bank account carried by A. Edward Harnik or Edward's Art Gallery, bankrupt, and no record entry of the receipt of said sum of money was made upon any of the books or records kept by the said bankrupt.

"4. That A. Edward Harnik closed his place of business known as Edward's Art Gallery on April 15, 1956, and the said place of business remained closed thereafter; that on April 27, 1956, A. Edward Harnik, individually, Pauline Harnik, his wife, individually, and A. Edward Harnik and Pauline Harnik, doing business as Edward's Art Gallery, filed voluntary petitions in

bankruptcy; that according to the schedules filed, neither of said bankrupts listed the sum of $6,127.00 as an asset and did not, in fact, turn over said sum of money to the Trustee in Bankruptcy.

"5. That A. Edward Harnik, bankrupt, has admitted under oath that he received this sum of money and that he is the only one responsible for the money; that the said A. Edward Harnik further testified that he had lost the money gambling and paying gambling debts; that the said A. Edward Harnik refused to disclose the names of the person or persons to whom he had allegedly paid gambling debts or with whom allegedly he had gambled; that the said A. Edward Harnik further refused to answer any and all questions propounded to him as to when he gambled, where he gambled, with whom he gambled, the names of any horses he is alleged to have bet on, whether he won any money on such wagers, or whether or not he had in his possession any evidence, such as receipts, tickets or documents of any kind, reflecting his gambling transactions, it being the contention of the said A. Edward Harnik that the disclosure of any such information would tend to incriminate him and that under the Fifth Amendment to the Constitution of the United States of America, he was not required to answer such questions.

"6. The refusal of the bankrupt to frankly answer the questions propounded to him and his admission that he received this large sum of money within a few days before the filing of his voluntary petition in bankruptcy is not a sufficient answer and the only conclusion is that he still has the money in his possession.

"From the above findings of fact, the court concludes that the Trustee's petition should be granted and that the said A. Edward Harnik

be required to turn over to the Trustee in Bankruptcy the sum of $6,-127.00 cash.

"It is therefore, by the Court ordered, that the said A. Edward Harnik, within 10 days after service upon him of a copy of this order, turn over and deliver to Sigun Rasmussen, Trustee in Bankruptcy, the sum of $6,127.00 cash.

"Dated this 26 day of March, 1957."

It will be noted that in finding of fact No. 6 the Referee referred to the fact that the bankrupt freely admitted having received the money on April 5, 1956, and that he either lost it gambling or used it to pay gambling debts that he owed at that time, and the Referee was of the opinion that the refusal of the bankrupt to answer the questions propounded to him, in which he was asked to disclose the names of the person or persons to whom he had allegedly paid gambling debts or with whom he had gambled, or when and where he had gambled, the names of any horses that he bet on, and whether he won any money on such wagers, or whether he had in his possession any evidence such as receipts, tickets or documents of any kind, reflecting his gambling activities, was not a sufficient showing on the part of the bankrupt, and the conclusion of the Referee was "that he still has the money in his possession".

■■ It is true that the bankrupt, after admitting that he received the sum of money in cash and that he lost it gambling, claimed his constitutional privilege against incrimination by refusing to answer any question propounded to him which might lead to a prosecution for such gambling.

There is no provision in the Bankruptcy Act which removes from a witness the protection of the Constitution. The provisions of Section 7, sub. a(10), [11 U.S.C.A. § 25, sub. a(10)], provide that no testimony given by a bankrupt shall be offered in evidence against him in any criminal proceeding, except such testimony as may be given by him in

the hearing upon objections to his discharge. The Referee, although apparently approving the questions that were propounded, did not compel the bankrupt to answer the questions against which the bankrupt asserted his constitutional privilege.

The bankrupt had the right to invoke the protection of the Fifth Amendment, notwithstanding the above statutory provision, and it is clear that had the questions been answered by the bankrupt, the answers, in all probability, would have afforded a means to search out other testimony which would, no doubt, incriminate him. The bankrupt was within his rights in claiming the protection of the Constitution. Counselman v. Hitchcock, 142 U.S. 547, 562, 12 S.Ct. 195, 35 L.Ed. 1110; Arndstein v. McCarthy, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138.

In Edelstein v. United States, 8 Cir., 149 F. 636, at page 642, 9 L.R.A.,N.S., 236, the court, in speaking of the protection afforded by the Fifth Amendment, said:

"The inhibition not only protects one from the disclosure of facts which would tend to prove his guilt, but also from disclosure of facts which might furnish a clue or a link in a chain of evidence by which a criminal offense might be made known."

See also, Vol. 1, Collier on Bankruptcy, 14th Ed., page 1004, Sec. 7.21.

In considering whether the order of the Referee is valid, the Court must determine whether the Referee was correct in his conclusion that the bankrupt "still has the money in his possession", or that he had it in his possession on the date he received notice that the petition for a turnover order had been filed.

In Maggio v. Zeitz, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476, the court, speaking through Mr. Justice Jackson, defined turnover procedure as a judicial innovation by which the court seeks efficiently and expeditiously to accomplish the ends prescribed by the Bankruptcy Act. The court then calls attention to the various sections of the Act defining the duties of the Trustee and Referee in Bankruptcy and the correlative duties of the bankrupt. Attention is also called to the sections of the statute which impose criminal sanctions on the bankrupt for failure to discharge his duties, and the court, at page 62 of 333 U.S., at page 404 of 68 S.Ct., said:

"Courts of bankruptcy have no authority to compensate for any neglect or lack of zeal in applying these prescribed criminal sanctions by perversion of civil remedies to ends of punishment, as some judges of the Court of Appeals suggest is being done."

Again, on page 63 of 333 U.S., on page 405 of 68 S.Ct., the court said:

"When supported by 'clear and convincing evidence,' the turnover order has been sustained as an appropriate and necessary step in enforcing the Bankruptcy Act. Oriel v. Russell, 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419; Cooper v. Dasher, 290 U.S. 106, 54 S.Ct. 6, 78 L.Ed 203. See also Farmers & Mechanics National Bank v. Wilkinson, 266 U.S. 503, 45 S.Ct. 144, 69 L.Ed. 408.

"But this procedure is one primarily to get at property rather than to get at a debtor. Without pushing the analogy too far, it may be said that the theoretical basis for this remedy is found in the common law actions to recover possession—detinue for unlawful detention of chattels and replevin for their unlawful taking—as distinguished from actions in trespass or trover to recover damages for the withholding or for the value of the property. Of course the modern remedy does not exactly follow any of these ancient and often overlapping procedures, but the object—possession of specific property—is the same. The order for possession may extend to proceeds of property that has been disposed of, if they are sufficiently identified as such. But it is es-

**509**

sentially a proceeding for restitution rather than indemnification, with some characteristics of a proceeding in rem; the primary condition of relief is possession of existing chattels or their proceeds capable of being surrendered by the person ordered to do so. It is in no sense based on a cause of action for damages for tortious conduct such as embezzlement, misappropriation or improvident dissipation of assets.

"The nature and derivation of the remedy make clear that it is appropriate only when the evidence satisfactorily establishes the existence of the property or its proceeds, and possession thereof by the defendant at the time of the proceeding. While some courts have taken the date of bankruptcy as the time to which the inquiry is directed, we do not consider resort to this particular proceeding appropriate if, at the time it is instituted, the property and its proceeds have already been dissipated, no matter when that dissipation occurred. Conduct which has put property beyond the limited reach of the turnover proceeding may be a crime, or, if it violates an order of the referee, a criminal contempt, but no such acts, however reprehensible, warrant issuance of an order which creates a duty impossible of performance, so that punishment can follow. It should not be necessary to say that it would be a flagrant abuse of process to issue such an order to exert pressure on friends and relatives to ransom the accused party from being jailed."

In Re Rosser, 8 Cir., 101 F. 562, the validity of a turnover order was considered, and the court, beginning at page 565, by Judge Walter H. Sanborn, said:

"Such orders constitute one of the essential means by which the court and the referee are empowered to collect the estate of the bankrupt. It is a broad and comprehensive power, and great caution should be exercised to observe its limits and to issue under it only lawful orders. But, without its lawful exercise, the administration of the estates of bankrupts would in many cases be so complicated and tedious that all the assets would be wasted in litigation, and the beneficent purpose of the bankrupt law would fail of accomplishment. *Two essential facts limit this power and condition its lawful exercise. They are that the money or property directed to be delivered to the trustee or other officer of the court is a part of the bankrupt estate, and that the bankrupt or person ordered to deliver it has it in his possession or under his control at the time that the order of delivery is made.* If the property is not a part of the estate, obviously no lawful order for its delivery to the trustee can be made. If the money or property in controversy was a part of the estate of the bankrupt, but before the order for its delivery is made he has squandered, disposed of, or lost it, so that it is not in his control or possession, and he cannot obtain and deliver it at the time the order of delivery is made, or within a reasonable time thereafter, it cannot be a lawful order, because the court may not order one to do an impossibility, and then punish him for refusal to perform it. The punishment of the bankrupt for such acts must be sought under the provisions of the bankrupt law relative to the fraudulent concealment of the property of the estate and the making of false oaths relative thereto. But, if it appears to the satisfaction of the referee or the court that property of the bankrupt estate is in the control or possession of the bankrupt, a lawful order for its delivery to the trustee may be made, and a refusal to obey this order may be punished as a contempt of court, both under the general law relative to contempts and under the specific provisions of the bankrupt act." (Emphasis added.)

See also, Sheehan v. Hunter, 8 Cir., 133 F.2d 303.

In Vol. 2, Collier on Bankruptcy, 14th Ed., at page 536, it is said:

"From this it is clear that a turnover proceeding is an essential one 'by which the court seeks efficiently and expeditiously to accomplish ends prescribed' by the Bankruptcy Act. The primary purpose of a turnover order is 'to get at property rather than get at the debtor', and while, as hereinafter noted, the order may extend to the proceeds of the property when sufficiently identified, the proceeding is 'essentially * * * for restitution rather than indemnification, with some characteristics of a proceeding in rem; the primary condition of relief is possession of existing chattels or their proceeds capable of being surrendered by the person ordered to do so.' A turnover proceeding 'is in no sense based on a cause of action for damages for tortious conduct such as embezzlement, misappropriation or improvident dissipation of assets.' "

The evidentiary facts are not in dispute. The bankrupt admitted receiving the sum of money in question on April 5, 1956. He closed his store ten days later, April 15, and twelve days after closing his store, April 27, filed his petition for adjudication as a bankrupt, and was adjudged a bankrupt on the date the petition was filed. The bankrupt was examined at the first meeting of the creditors, and again under the provisions of Section 21, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 44 sub. a. Apparently upon both examinations the bankrupt testified that he had lost the money in gambling or had used it to pay gambling debts. There was no direct testimony that the bankrupt had the money or any part of it in his possession during the proceedings on the petition for a turnover order. However, the Referee in his opinion, which is a part of his certificate, on Page 11 cited Remington on Bankruptcy, Vol. 5–A, Sec.

2434, as his authority for the recognition of the presumption in the law of the continuance of an existing state or condition. The Referee calls attention to the fact that the bankrupt had possession of the money twenty-two days prior to the filing of his petition for adjudication as a bankrupt, and in speaking of the presumption said: "It is applicable in turnover proceedings in aid of proof of possession of the property in question at the time he is ordered to turn it over, provided it is shown that he had possession of the property at some prior time." In further commenting on the Remington citation, the Referee said:

"Continuing, the author states that many decisions will be found in which this presumption of continuance of possession has served as the basis for turnover orders, notwithstanding the proved date of possession considerably ante-dated the order or the hearing on application for the order, and frequently where the proof only went to possession at, or even before, the date of bankruptcy."

The Referee cites In re Cohan, 3 Cir., 41 F.2d 632; In re H. Magen Company, 2 Cir., 10 F.2d 91; In re Rosser, 8 Cir., 101 F. 562; In re Meier, 8 Cir., 182 F. 799.

The bankrupt contends that it is incumbent upon the Trustee to show by clear and convincing evidence that the bankrupt had in his possession the money as of the time of the hearing on the turnover order, while the Trustee contends that after the proof has shown the bankrupt had the money in his possession within a reasonable time prior to bankruptcy, that the burden then shifts to the bankrupt to satisfactorily explain his disposition of the money.

In Maggio v. Zeitz, supra, beginning at page 64 of 333 U.S., at page 405 of 68 S.Ct., the court said:

"It is evident that the real issue as to turnover orders concerns the burden of proof that will be put on the trustee and how he can meet it.

This Court has said that the turnover order must be supported by 'clear and convincing evidence,' Oriel v. Russell, 278 U.S. 358, 49 S.Ct. 173, 174, 73 L.Ed. 419, and that includes proof that the property has been abstracted from the bankrupt estate and is in the possession of the party proceeded against. It is the burden of the trustee to produce this evidence, however difficult his task may be.

"The trustee usually can show, that the missing assets were in the possession or under the control of the bankrupt at the time of bankruptcy. To bring this past possession down to the date involved in the turnover proceedings, the trustee has been allowed the benefit of what is called a presumption that the possession continues until the possessor explains when and how it ceased. This inference, which might be entirely permissible in some cases, seems to have settled into a rigid presumption which it is said the lower courts apply without regard to its reasonableness in the particular case.

"However, no such presumption, and no such fiction, is created by the bankruptcy statute. None can be found in any decision of this Court dealing with this procedure. Language can, of course, be gleaned from judicial pronouncements and texts that conditions once existing may be presumed to continue until they are shown to have changed. But such generalizations, useful enough, perhaps, in solving some problems of a particular case, are not rules of law to be applied to all cases, with or without reason.

"Since no authority imposes upon either the Court of Appeals or the Bankruptcy Court any presumption of law, either conclusive or disputable, which would forbid or dispense with further inquiry or consideration of other evidence and testimony, turnover orders should not be issued, or approved on appeal, merely on proof that at some past time property was in possession or control of the accused party, unless the time element and other factors make that a fair and reasonable inference. Under some circumstances it may be permissible, in resolving the unknown from the known, to reach the conclusion of present control from proof of previous possession. Such a process, sometimes characterized as a 'presumption of fact,' is, however, nothing more than a process of reasoning from one fact to another, an argument which infers a fact otherwise doubtful from a fact which is proved.

"Of course, the fact that a man at one time had a given item of property is a circumstance to be weighed in determining whether he may properly be found to have it at a later date. But the inference from yesterday's possession is one thing, that permissible from possession twenty months ago quite another. With what kind of property do we deal? Was it salable or consumable? The inference of continued possession might be warranted when applied to books of account which are not consumable or marketable, but quite inappropriate under the same circumstances if applied to perishable merchandise or salable goods in considerable demand. Such an inference is one thing when applied to a thrifty person who withdraws his savings account after being involved in an accident, for no apparent purpose except to get it beyond the reach of a tort creditor, see Rosenblum v. Marinello, 2 Cir., 133 F.2d 674; it is very different when applied to a stock of wares being sold by a fast-living adventurer using the proceeds to make up the difference between income and outgo.

"Turnover orders should not be issued or affirmed on a presumption thought to arise from some isolated

circumstance, such as one time possession, when the reviewing court finds from the whole record that the order is unrealistic and unjust. No rule of law requires that judgment be thus fettered; nor has this Court ever so prescribed. Of course, deference is due to the trial court's findings of fact, as prescribed by our rules, but even this presupposes that the trier of fact be actually exercising his judgment, not merely applying some supposed rule of law. In any event, rules of evidence as to inferences from facts are to aid reason, not to override it. And there does not appear to be any reason for allowing any such presumption to override reason when reviewing a turnover order.

"We are well aware that these generalities do little to solve concrete issues. The latter can be resolved only by the sound sense and good judgment of trial courts, mindful that the order should issue only as a responsible and final adjudication of possession and ability to deliver, not as a questionable experiment in coercion which will recoil to the discredit of the judicial process if time proves the adjudication to have been improvident and requires the courts to abandon its enforcement."

See also, 2 Collier on Bankruptcy, 14th Ed., pages 536–546, inclusive.

Order 47 of the General Orders in Bankruptcy, 11 U.S.C.A. following section 53, provides that the judge in reviewing an order of the Referee "shall accept his findings of fact unless clearly erroneous", but the presumption of correctness of the Referee's findings is not extended to his conclusions of law. Walker v. Commercial National Bank of Little Rock, 8 Cir., 217 F.2d 667, 681; In re Van Meter, D.C.W.D.Ark., 135 F.Supp. 781, 782.

In the instant case the Trustee had known for several months that the bankrupt had not accounted for the money now sought to be recovered by the turnover order.

Official Form No. 3 attached to the petition of the bankrupt contains various questions intended to elicit complete information as to the state of the finances and past operations of the bankrupt. Question No. 13 is as follows:

"Have you suffered any losses, from fire, theft, or gambling during the year immediately proceeding the filing of the petition herein? (If so, give particulars, including dates, and the amounts of money or value and general description of property lost.)"

That question was not answered.

Later the Trustee filed a suit in this Court against certain other individuals, including the Rector Trust Estate, seeking to recover this identical sum of money. The Trustee in that suit was contending that the sum of money was paid to the bankrupt in an effort to aid him in defrauding his creditors. That suit was dismissed upon motion of the Trustee on March 22, 1957.

There is no doubt that the bankrupt is, or at least has heretofore been, a man who indulged rather heavily in gambling without much regard to his obligations to legitimate creditors. Of course, the bankrupt should have accounted to the Trustee for the money, but the court would not be justified in inferring that because the bankrupt had the money in his possession on April 5, 1956, that he still had it in his possession or control on February 25, 1957, the date of the hearing on the petition for the turnover order. The so-called presumption that the possession continues until the possessor explains when and how it ceased cannot be applied without regard to its reasonableness in the case then under consideration. Reason impels the conclusion that the gambling propensities of the bankrupt were such that it would be difficult, if not impossible, for him to retain in his possession $6,127 in currency and to disregard his urge to gamble. The court should not issue a turnover order as a questionable experiment

in coercion, even though the action of the bankrupt, in the opinion of all honest men, may be dishonest and a fraud upon his legitimate creditors.

Therefore, an order is being entered today sustaining the petition for review and setting aside and holding for naught the turnover order of the Referee dated March 26, 1957.