**UNITED STATES of America and James R. Hilferty, Special Agent, Internal Revenue Service**

v.

**BASIL INVESTMENT CORPORATION, and Robert B. Graham, Sr.**

**UNITED STATES of America and James R. Hilferty, Special Agent, Internal Revenue Service**

v.

**BASIL INSURANCE AGENCY, INC. and Robert B. Graham, Sr.**

Civ. A. Nos. 81–0333, 81–0334.

United States District Court, E. D. Pennsylvania.

Nov. 19, 1981.

Joseph M. Masiuk, Asst. U.S. Atty., Philadelphia, Pa., S. Martin Teel, Atty.-Tax Div., U.S. Dept. of Justice, Washington, D. C., for plaintiff.

Robert C. Whitley, III, Doylestown, Pa., for Basil Ins. & Basil Investment.

Robert B. Graham, pro se.

## MEMORANDUM and ORDER

SHAPIRO, District Judge.

### I. INTRODUCTION

In these third-party summons proceedings, the government has petitioned to hold defendants in contempt for failure to produce and give testimony concerning records of two corporations of which the individual defendant is the principal officer. Following a hearing on the petition on September 17, 1981, defendant filed a motion to dismiss. Upon consideration of the record of the hearing, the government's post-hearing memorandum, taxpayer's motion to dismiss, memorandum in support thereof, and the government's memorandum in opposition thereto, the court finds the defendants in contempt of the court's Orders of March 16, 1981 and denies defendants' motion to dismiss both proceedings.

The Internal Revenue Service ("IRS") seeks to enforce third-party summonses against Robert B. Graham, Sr. ("Graham"), the President of Basil Investment Corporation and Basil Insurance Agency, Inc. to investigate the tax liability of Graham for the years of 1976 through 1978. The summonses were properly served by the IRS on February 8, 1980, pursuant to § 7602 of the Internal Revenue Code. Upon Graham's non-compliance with the summonses, the IRS petitioned this court for enforcement pursuant to §§ 7604 and 7602 of the Code. After a hearing on March 13, 1981, this court, by Orders of March 16, 1981, com-

pelled Graham as President of Basil Investment Corporation and Basil Insurance Agency, Inc. to,

> ... appear before Special Agent James R. Hilferty, or his designated representative, at the time and place to be designated by Special Agent Hilferty in writing to the defendant ... then and there to be sworn, to give testimony, and to produce for examination and copying the books and records demanded by the summons served upon the defendants on March 13, 1980, the examination to continue from day to day until completed....[1]

On June 15, 1981, Graham came with three "witnesses" to Special Agent Hilferty's office in Philadelphia. Present on behalf of the government were Neal F. Halbe, Special Agent, and Robert P. Brennan, Revenue Agent. Graham alleges that he came prepared to comply with the March 16, 1981 Orders by responding to questions concerning the records he had with him; he was unwilling at that time to allow Hilferty to examine or photocopy the documents.

Graham's appearance before Special Agent Hilferty was deliberately designed by Graham to frustrate the purpose of the proceeding. Much of the time was spent in discussions between Graham and the government personnel on, *inter alia*, whether photographs could be taken in the Federal Building (N.T. 1–2, 11), whether the government employees were really who they said they were (N.T. 2–5), and whether the March 16, 1981 Orders required that the documents be available for copying (N.T. 5, 19–29). The interview was ended without any substantive response by Graham to questions concerning the documents and the tax matters involved.

Subsequent to this interview the IRS filed a petition for an order to show cause why Graham should not be held in contempt. This petition was based on Graham's refusal to allow photocopying of his records and on his failure to produce specific records rather than summaries of them. A show cause hearing, ordered for September 4, 1981, was continued to September 17, 1981 after Graham delivered to this court on July 27, 1981 some of the documents requested by the government. Graham later testified at the show cause hearing that he did not then intend that the records he delivered would be photocopied by the IRS (N.T. 134); his signed statement and an affidavit he filed on August 14, 1981 state that the papers are made available to the government "for examination and copying." Pursuant to this authorization, Deputy Clerk Ellen Starr made copies for the IRS on August 28, 1981 with Special Agent Hilferty present.

Graham represented on August 19, 1981, that these were "all the records required to be produced by the Order to show cause...." At the show cause hearing the government submitted Special Agent Hilferty's affidavit detailing the records that were allegedly covered by this summons but not provided by Graham. The government asks for a coercive indeterminate term of confinement or daily fine until Graham produces the remaining records covered by the summonses and testifies as to the contents of those records. Graham contends, *inter alia*, that he does not possess the records requested by the government, so that his compliance with the summonses in this respect is impossible.

## II. DISCUSSION

### A. *Graham's Objection to Criminal Proceedings*

Graham argues that this entire investigation is impermissible because its purpose is to convict him of crime. The government may eventually institute criminal proceedings against Graham but its present proper purpose is to determine his civil tax liabilities for the years 1976 through 1978. The civil nature of this proceeding was determined after hearing by

---

1. Graham has taken an appeal of these Orders to the Court of Appeals for the Third Circuit, Civil Action Nos. 81–1471 and 81–1473. However, on April 29, 1981 the Court of Appeals denied Graham's motions for stays pending appeal of the March 16, 1981 Orders, and allowed this court to proceed with the action.

the court's Orders of March 16, 1981 and is again found as a fact on the present record. *United States v. Erdner*, 422 F.2d 835, 836 (3d Cir. 1970), reiterated the rule in this Circuit that "even if the investigation by a special agent of the Internal Revenue Service is principally criminal, a summons under § 7602 is valid where the party resisting the summons 'does not negative the existence of proper civil purpose.' *United States v. DeGrosa*, 405 F.2d [926] at 928." This rule controls here.

Moreover, the validity of the court's Orders enforcing the third-party summonses is not at issue in the present proceeding against Graham. These Orders have been appealed and their validity will be determined by the Court of Appeals. All that is now at issue is whether Graham was and is in contempt of the March 16, 1980 Orders which the Court of Appeals has refused to stay and permitted this court to enforce pending disposition of the appeals.

■ Graham has repeatedly asserted, both in his pleadings and at the show cause hearing, that the government's purpose in obtaining the summoned documents is to institute criminal charges against him and that the summonses and court orders resulting from them are therefore unconstitutional. While Graham may not and will not be forced to testify to anything that could implicate him criminally,[2] his objections have no merit as they relate to the production of documents. The summonses at issue are third-party summonses. They request documents not from Graham personally but from his corporations and from him only in his capacity as president.

The law in this Circuit is quite clear that the Constitution does not bar compelling the production of documents in such circumstances. In *United States v. Brobeck*, 363 F.Supp. 1035 (W.D.Pa.1973), *aff'd*, 491 F.2d 751 (3d Cir.), *cert. denied*, 416 U.S. 984, 94 S.Ct. 2387, 40 L.Ed.2d 761 (1974), the president of a Volkswagen dealership sought to raise Fifth Amendment objections to a summons of his corporation's rec-

ords. Although the IRS was pursuing Brobeck's civil tax liability at the time of the show cause hearing, the documents being sought might tend to incriminate the defendant. That factor was held irrelevant, however, because:

> The Fifth Amendment privilege against self-incrimination is a purely personal one extending protection to the private papers and effects of the person claiming the privilege. [Citations omitted]. Further, as the court observed in *Caro v. Bingler*, 242 F.Supp. 418, 420 (W.D.Pa.1965), '[a]ny claim to personal privilege is relinquished as to corporate records by the choice of the corporate form for an individual's business even if the corporation is a mere alter ego of its owner and the records would tend to incriminate said owner. *Hair Industry, Ltd. v. United States*, 340 F.2d 510 (C.A.2, 1965).'

*Brobeck*, 363 F.Supp. at 1037.

**B.** *The Civil Nature of the Contempt Proceedings*

■ Contempt proceedings are either civil or criminal. Criminal contempt is to punish for a contemnor's past actions; its penalty is a fine of a specified amount or a term of confinement for a specific period and trial by jury is required upon the demand of the accused. *Latrobe Steel Co. v. United Steelworkers, et al.*, 545 F.2d 1336, 1343 (3rd Cir. 1976). These actions are for civil contempt. Two forms of civil contempt sanctions exist. Coercive contempt sanctions "look to the future and are designed to aid the plaintiff by bringing a defiant party into compliance with the court order," while compensatory sanctions seek to "compensate the complainant through the payment of money for damages caused by past acts of disobedience." *Latrobe Steel*, 545 F.2d at 1344. Depending on the circumstances, either form of contempt sanction may be appropriate in an IRS summons enforcement action. *United States v. Asay*, 614 F.2d 655, 659 (9th Cir. 1980). The government presently seeks only coercive contempt sanctions.

**2.** See Part B below.

The March 16, 1980 Orders compelled Graham to turn over two corporations' records relating to his tax liabilities for the years 1976–1978, and to testify regarding the contents of those records. Section 7604 of the Internal Revenue Code confers upon district courts the power to make such orders to enforce summonses as deemed proper, "not inconsistent with the law for the punishment of contempt ...." The "methods that may be employed to coerce a recalcitrant party" in a contempt situation are "many and varied," *Latrobe Steel*, 545 F.2d at 1344; they include indeterminate periods of confinement and day-to-day fines until there has been compliance. Thus, for example, in *United States v. Brobeck, supra*, an action to enforce compliance with an IRS summons, the court found indeterminate confinement for the contemnor appropriate because of failure to produce corporate records in accordance with court Order.

■ Graham argues that he cannot be held in contempt because he does not have possession of the records that the government is seeking. Impossibility is, of course, a bar to the imposition of coercive contempt sanctions, but "when the person charged is responsible for the inability to comply," it is not a complete defense to civil contempt proceedings. *Asay*, 614 F.2d at 660. So if Graham did at one time possess such records but has disposed of or transferred possession of them in anticipation of the government's summons, Graham would not avoid sanctions for his actions; the government would still be entitled to petition the court for compensatory contempt sanctions in place of the coercive sanctions it is now seeking. *Id.* However, on the present record Graham has not proved that the records do not exist nor has he admitted that he destroyed them.[3]

■ The government is seeking coercive contempt sanctions not only for Graham's alleged failure to deliver all the records summoned but also for his failure to answer in good faith questions the IRS has concerning the records Graham was ordered to produce. The government is entitled to such testimony under § 7602(3) of the Internal Revenue Code, provided that Graham may not be compelled to testify as to matters which might tend to incriminate him. Graham's Fifth Amendment privilege against self-incrimination is as applicable here as it is to any other questioning of a citizen; the court has the authority to order Graham to testify subject to his right to assert objections as to specific questions on Fifth Amendment grounds. *United States v. Hankins*, 565 F.2d 1344, 1349–50 (5th Cir. 1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979).

### C. Graham's Violation of the Outstanding Orders

#### 1. Graham's Testimony at the June 15, 1980 Appearance

■ Graham was ordered on March 16, 1980 to appear before Special Agent Hilferty and "give testimony" in response to the government's questions on the details of the books and records that he was ordered to produce. His conduct at his June 15, 1980 appearance did not constitute compliance with those Orders. An examination of the entire transcript reveals a purposeful scheme to divert the questioning to practically any subject other than the records produced. At the hearing, Graham repeatedly stated that he was trying to comply with the Orders in good faith but was so afraid of Special Agent Hilferty that he was unable to comply:

> THE COURT: ... whether you were afraid to comply; whether they were courteous or discourteous does not matter unless you are contending that they physically precluded you from complying.
>
> MR. GRAHAM: Your Honor, I'm doing just that and I'm trying to prove it. If somebody were standing there with a gun at you or a pencil making threatening gestures at you at that particular point, can you possibly—I don't—you

---

**3.** See Part C below.

have no idea what these people have put me through for the last three years; ... I'm frightened to death. (N.T. 113). .

The court finds on the record as a whole that Graham was not prevented from complying and that his conduct put him in contempt of the court's Orders.

However, Graham will not be required to appear for further questioning because of the likelihood he will assert his Constitutional privilege against self-incrimination. The court could order that Graham be questioned before a United States Magistrate, who would rule on each question as to which the privilege is asserted; *see, Hankins*, at 1349–50. But the questioning of Graham is no longer necessary. The government had adequate opportunity to question Graham about the existence of the documents at the hearing and has not shown, in its memoranda or at the hearing, any benefit to be derived beyond that questioning. In light of this and the inevitability of the constant conflicts which would occur at such questioning, the March 16, 1980 Orders will not be further enforced to require Graham's testimony.

### 2. The Production of the Complete Set of Summoned Documents

■ There can be no question that Graham violated this court's Orders when he appeared before Special Agent Hilferty on June 15, 1980 and refused to allow Hilferty to copy the records that he had brought to the meeting. The Orders clearly stated that Graham appear before Special Agent Hilferty to "produce for examination and copying the books and records demanded by the summons ...." Courts may authorize the IRS to copy summoned records and "it is inconceivable today that a right to examine and copy from voluminous files does not also assume that photostating can be done." *McGarry v. Riley*, 363 F.2d 421, 424 (1st Cir.

1966). Graham was properly served with the Orders to produce for examination and photocopying.

At the June 15, 1981 appearance, Graham argued that the court had not ordered him to allow the IRS to copy his documents (N.T. 19–29) because Special Agent Hilferty's letter notifying him to appear on that date did not explicitly state that the records were to be copied by the IRS. But Special Agent Hilferty's letter could not supersede the Orders of the court with which Graham was required to comply. Hilferty did not have a copy of the court Orders with him when Graham appeared (N.T. 17), but Hilferty's failure to confront Graham with the text of the court Orders. does not excuse Graham's non-compliance. Graham repeatedly demanded that Special Agent Hilferty contact this court in order to have the judge clarify the Orders at that time. (N.T. 20–29). The Orders, however, were perfectly clear and Graham's conduct on that date is inexcusable.

On July 27, 1981, Graham mitigated that contempt by delivering certain documents to the court; he claims that action constituted full compliance. But Graham testified at the show cause hearing that he did not then intend that the court allow IRS photocopying of these records.[4] Upon receiving from Graham on August 19, 1981 a signed statement that the records were produced for examination and copying, the records Graham delivered were copied for the government. Had they been complete, the government's entitlement to coercive contempt sanctions would be less clear.

However, the records were not complete. At the show cause hearing, Special Agent Hilferty first testified that the following items relating to Basil Investment Corporation for the year 1978 were produced: bank statements and cancelled checks for Girard Bank Accounts No. 2–287–605 and 2–544–

---

4. THE COURT: When you delivered the papers to my Chambers, did your state that they were for the government to copy?
   THE WITNESS [Graham]: No, No, because I at that point never believed you would sign such an asinine order to allow them to·copy

them. I never believed you would waive my Constitutional right. That's why I gave you the books, because I believed that you would uphold the Constitution of the United States. I knew he [Hilferty] never would. (N.T. 134).

773 (except for the months of January and February); check stubs for Account No. 2–287–605; cash receipt book and cash disbursement book; and the general ledger and general journal. Hilferty then stated that the following documents ordered to be produced relating to Basil Investment Corporation for the tax year 1978 were missing from the box: check stubs from Girard Bank Account No. 2–544–773 for the entire year; January and February, 1978 bank statements and cancelled checks for Girard Bank Accounts No. 2–287–605 and 2–544–773; individual client account records; invoices and receipts supporting book entries for corporate expenses; brokerage commission statements; correspondence files; and supporting documentation for loans and other non-income items (N.T. 13–15).

With regard to Basil Insurance Agency, Inc., for which documents relating to the tax years 1976–1978 were summoned, Hilferty stated that Graham produced the following: bank statements, cancelled checks, and check stubs for Girard Bank Account No. 2–298–990 for 1978; the 1978 cash receipts book and cash disbursements book; and the 1978 general ledger and general journal. Hilferty then testified that the following items relating to Basil Insurance Agency, Inc. for the tax years 1976–1978 were missing from the box: all records relating to 1976 and 1977; individual client account records; invoices and receipts supporting book entries for corporate expenses; commission statements; and supporting documentation for loans and other non-income items (N.T. 17–19).

■ Graham did not seek to persuade the court that the items the government states were missing were in fact included in the box; instead he testified that he did not possess the missing records at the time of the hearing. To make a prima facie showing of contempt, the government need prove only that the defendant has failed to comply with a valid court order. It need not prove that the defendant is able to comply. *United States v. Rylander,* 656 F.2d 1313, 1318 (9th Cir. 1981). The burden is then on the defendant to produce evidence that he is unable to comply:

[T]he federal rule is that one petitioning for an adjudication of civil contempt does not have the burden of showing that the respondent has the capacity to comply .... The contrary burden is upon the respondent. To satisfy this burden the respondent must show 'categorically and in detail' why he is unable to comply.

*N.L.R.B. v. Trans Ocean Export Packing, Inc.,* 473 F.2d 612 (9th Cir. 1973) (citations omitted).

■ In *United States v. Rylander, supra,* the court held that if there is a valid claim of Fifth Amendment privilege as to a court enforced IRS summons, defendant's burden is satisfied so long as the defendant produces sufficient evidence of his inability to comply to raise a question of fact. 656 F.2d at 1318–19. That is, a defendant need not produce categorical and detailed evidence demonstrating his inability to comply with the court's Order enforcing the summons if he "properly claims that his testimony as to the whereabouts of the documents might be incriminatory." *Id.* This holding is based on the defendant's privilege against self-incrimination with regard to potential criminal liability for destruction of the summoned documents, rather than for tax law violations arising out of civil tax investigations.

Graham does assert that the tax investigation underlying this court's enforcement Orders is in violation of his Fifth Amendment rights but unlike the taxpayer in *Rylander,* Graham has not asserted a Fifth Amendment privilege as to his inability to produce the summoned documents. He has instead produced evidence purportedly to demonstrate in detail legitimate reasons for the non-existence of the summoned documents. Graham's witnesses and his own testimony at the hearing sought to establish that he had never had control over some of the requested records or that they had never existed. With regard to the individual client records of Basil Investment Corporation, Graham stated that he had paid a private firm to maintain the records so that Basil had discharged itself of that responsi-

bility (N.T. 99–100). With regard to the bank account information, Graham stated that the January and February, 1978 statements and cancelled checks were missing because the account in question was dormant during those months (N.T. 124); however, he later contended that they were taken by an attorney who deposed him in an unrelated case. (N.T. 137–139).

To satisfy his burden, Graham must establish his contentions with more than "evidence or ... his own denials which the court finds incredible ...." *Maggio v. Zeitz*, 333 U.S. 56, 76, 68 S.Ct. 401, 411, 92 L.Ed. 476 (1947). In such circumstances, the court has the power to impose such coercive sanctions on the defendant that—if he continues to deny the existence of the documents while being confined in jail or while paying fines—might convince the court of the documents' non-existence. *Id.* In other words, if a court disbelieves the defendant, it may put that defendant to the test. This court finds Graham's evidence and denials incredible. The justifications he advanced at the hearing are directly contradicted by evidence or testimony of record.

Graham's argument that he did not keep individual client records because they were maintained by an independent company is directly contradicted by testimony Graham gave at a deposition in a case in which Graham is suing a newspaper defendant for allegedly libelous statements it made about Graham's business practices. *Graham v. Today's Post, et al.*, Court of Common Pleas, Montgomery County, CA No. 79–17693. Graham testified under oath therein on November 6, 1980 that he maintained and possessed a complete set of business records, including individual client accounts:

Q. What business records are there which would identify these people by their name and the period of time in which they worked for or with you?

A. Oh, they're all through here (indicating the boxes). Each individual account that I brought with me has on it who was the agent involved, who the client was, who the representative was, who the agent was. It will tell you the whole transaction of what happened from the beginning to the end. They're very complete records. (Exhibit G–2, N.T. Graham deposition at 92).

Graham's admission directly contradicted his position at the hearing. Graham had the opportunity to explain the contradiction but he did not.

Graham also did not produce any evidence establishing the destruction or legitimate transfer of these records subsequent to November 6, 1980. This is especially significant because the original summonses were served upon Graham on February 8, 1980, so that he had the duty to retain possession of the documents. *Asay*, 614 F.2d at 660. In short, Graham has admitted subsequent to the service of the summons that he had the records which were the subject of the IRS summons, and he has not proved any reason, such as fire or theft, that would discharge him from his duty to retain possession.

Graham also made contradictory statements concerning the missing checking account documents at the show cause hearing. He stated:

Your honor, there has been some misunderstanding here for innuendoes made by opposing counsel and it's never been brought out to light. I would like to refer specifically to the missing check stubs and checks for one account. Your Honor, it was never brought out it was a dormant account. That's why it was missing. (N.T. 124).

Shortly thereafter, however, Graham changed his explanation. He remembered the previous charge he had made that an attorney in his libel case had possibly stolen some records from him:

THE WITNESS [Graham]: The two months that he [Hilferty] is moaning about were January and February. They happen to be part of the records because it comes back to me now thinking about it is that we gave them extra months to prove our point that the books were right.

THE COURT: You are saying at one prior time you delivered those records to Mr. Pennington, is that your testimony?

THE WITNESS [Graham]: They were part of the records that were going with the other records. Now, I wanted to bring that attorney in here from the court case [*Graham v. Today's Post, et al., supra*] because she possibly has these records and it wouldn't surprise me in least if they are holding them just to harass me. (N.T. 137–138).

By the time of his closing argument, Graham had forgotten this explanation, and was again espousing the dormant account theory. (N.T. 168). In light of the above contradictions and other statements reflecting adversely on Graham's credibility,[5] the court finds the government by clear and convincing evidence met its burden of proving Graham in contempt of this court's Orders of March 16, 1981 requiring him to turn over all his records summoned by the government.

Subsequent to the hearing on September 22, 1981 Graham filed a motion to dismiss based on his argument that he does not possess the documents sought by the government. He supports the motion with an affidavit, made by Richard G. Holloway, the former Basil employee who testified for the government at the hearing, averring:

I, RICHARD G. HOLLOWAY, hereby state that I specifically testified to Mr. Hilferty and Mr. Teel *previous* to the court testimony of September 17, 1981, that the customer records they were seeking were not a requirement of our office and therefor [sic] I threw them away

when they were no longer needed, usually within a couple of weeks. (Emphasis in original).

This post-hearing evidence, in seeming contradiction to the witness' testimony under oath at the show cause hearing and not subject to cross-examination by the government, is not adequate to satisfy defendant Graham's burden of proving the non-existence of the documents. Mr. Holloway was a witness at the hearing. Had he stated there what is now submitted by affidavit, the government would have had the opportunity to examine him regarding the statement. Holloway's credibility in making this statement could have been tested in open court. However, Graham has chosen to introduce this ambiguous item of evidence in a way that does not allow meaningful evaluation. As such, it is rejected by the court and Graham is bound by his admission under oath that the documents existed when the summonses were served.

### ORDER AS AMENDED PURSUANT TO FED.R.CIV.P. 60(a)

AND NOW, this 18th day of November, 1981, following a hearing on the petition for an order to show cause why defendants should not be held in contempt, the government's post-hearing memorandum, defendants' motion to dismiss and the government's memorandum in opposition thereto, and for the reasons stated in the accompanying Memorandum, it is ORDERED that:

1. Defendants' motions to dismiss are DENIED.

2. Defendant Robert B. Graham, Sr. ("Graham"), President of Basil Investment

---

5. The overall demeanor of the witness at the show cause hearing reflects adversely on his credibility:

Q. During the lunch hour today did you have an opportunity to read the transcript of the June 15, 1981 proceeding which you were given a copy of?

A. No. I'm so upset. I've got such a headache. My stomach is upset. I'm ready to throw up. I just can't concentrate on anything.

MR. TEEL: May we have a moment, Your Honor?

THE COURT: Yes. We'll take a brief recess to give you a chance to regain your [Graham's] composure.

THE WITNESS: Oh, I'm fine, your Honor. Let's go with the whole thing.

THE COURT: No, No, we'll give you a chance to recover your composure because you are testifying on cross-examination and I don't want you to say later you were not in physical condition to testify.

THE WITNESS: I'm in as good condition as—

THE COURT: We'll recess until 3:45. (N.T. 141–142).

Corporation and Basil Insurance Agency, Inc., shall comply with this court's Orders of March 16, 1981 by delivering forthwith to the Internal Revenue Service ("IRS") at its office in Philadelphia, Pa., all of the documents called for by the government's third-party summonses against Graham that were not delivered to this court on July 27, 1981:

A. Basil Investment Corporation:

  i. 1978 check stubs from Girard Bank Account No. 2–544–773;

  ii. January and February 1978 bank statements and cancelled checks for the year 1978 from Girard Bank Account Nos. 2–287–605 and 2–544–773;

  iii. Individual client account records for the tax year 1978;

  iv. Invoices and receipts supporting book entries for corporate expenses for the tax year 1978;

  v. Brokerage commission statements for the tax year 1978;

  vi. Correspondence files for 1978; and

  vii. Supporting documentation for loans and other non-income items for the tax year 1978.

B. Basil Insurance Agency, Inc.:

  i. Individual client account records for the tax years 1976–1978;

  ii. Invoices and receipts supporting book entries for corporate expenses for the tax years 1976–1978;

  iii. Commission statements for the tax years 1976–1978;

  iv. Supporting documentation for loans and other non-income items for the tax years 1976–1978; and

  v. All remaining records for the tax years 1976 and 1977 that have been ordered to be produced and which are not specifically enumerated in (i)–(iv) above, such as bank statements, cancelled checks, and check stubs for Girard Bank Account No. 2–298–990, cash receipt books, cash disbursement books, general ledgers, and general journals.

3. Five (5) days from the date of service of this Order, Graham shall be fined One Hundred Dollars ($100) if he continues to withhold the documents sought by the IRS and for each day that the documents are withheld in continuing violation of the March 16, 1981 Orders, shall be fined an additional One Hundred Dollars ($100).

4. If Graham has not delivered the documents within thirty (30) days from the date of service of this Order, a hearing will be held on *December 23, 1981* at *9:30 a. m.* in Courtroom 10–A, United States Courthouse, to determine what further action such as additional fines or incarceration is appropriate to enforce compliance with the Orders of the court.

5. A copy of this Order shall be personally served on defendant Graham by the United States Marshal.

6. There is no probable cause for appeal.